IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JOHN PORTER HOLCOME II, | § | NO. 5:20-CV-368-XR |
| AS NEXT OF FRIEND OF | § | |
| MINORS E.J.H AND P.J.H, | § | Consolidated with: |
| AND AS AN INDEPENDENT | § | 5:18-cv-00555-XR *(Holcombe)* |
| ADMINISTRATOR OF THE | § | 5:18-cv-00712-XR *(Vidal)* |
| ESTATES OF MINORS G.L.H, | § | 5:18-cv-00881-XR *(Uhl)* |
| E.R.H, AND M.G.H, | § | 5:18-cv-00944-XR *(Ramsey)* |
| | § | 5:18-cv-00949-XR *(McNulty)* |
| Plaintiff, | § | 5:18-cv-00951-XR *(Wall)* |
| | § | 5:18-cv-01151-XR *(Amador)* |
| vs. | § | 5:19-cv-00184-XR *(Brown)* |
| | § | 5:19-cv-00289-XR *(Ward)* |
| UNITED STATES OF | § | 5:19-cv-00506-XR *(Workman)* |
| AMERICA, | § | 5:19-cv-00678-XR *(Colbath)* |
| | § | 5:19-cv-00691-XR *(Braden)* |
| Defendant. | § | 5:19-cv-00706-XR *(Lookingbill)* |
| | § | 5:19-cv-00714-XR *(Solis)* |
| | § | 5:19-cv-00715-XR *(McKenzie)* |
| | § | |
| | § | |
| | § | |
| | § | |

**UNITED STATES ANSWER TO
PLAINTIFF'S ORIGINAL COMPLAINT**

The United States of America files this Answer to *Plaintiff John Porter Holcombe II's, as next of friend of Minors E.J.H. and P.J.H., and as an Independent Administrator of the Estates of Minors G.L.H., E.R.H., and M.G.H., Original Complaint*, asserting defenses and responding to each of the paragraphs as follows:

**First Defense**

The Court lacks subject matter jurisdiction over Plaintiff's claims.

## Second Defense

The original complaint fails to state a claim upon which relief may be based.

## Third Defense

The United States is not liable under the Federal Tort Claims Act (FTCA) because it did not owe a legal duty to the Plaintiff or their decedent.

## Fourth Defense

The alleged acts or omissions of the United States did not proximately cause the Plaintiff's decedent's death or the Plaintiff's alleged injuries.  In particular, a criminal act of a third party was the superseding cause of Plaintiff's harm.  Moreover, Plaintiff's harm was not foreseeable to the United States, and no act or omission of the United States was a substantial factor in Plaintiff's harm.

## Fifth Defense

The United States is not liable under the FTCA for violations of federal statutes or regulations.

## Sixth Defense

The claims do not allege a negligent or wrongful act by an employee of the Government.

## Seventh Defense

The alleged injuries were caused solely by the acts or omissions of other parties, persons, or entities, their servants, agents, representatives, or employees, none of whom are agencies or employees of the United States for whom the United States has any liability pursuant to the Federal Tort Claims Act.

## Eighth Defense

The FTCA misrepresentation exception, 28 U.S.C. § 2680(h), bars all of the Plaintiff's claims.

## Ninth Defense

The United States is not liable to the Plaintiff because the Brady Handgun Violence Prevention Act (Brady Act) precludes actions for damages based upon the failure of federal Employees to report information to National Instant Background Check System (NICS). 18 U.S.C. § 922(t)(6).

## Tenth Defense

The Plaintiff failed to exhaust administrative remedies.  In particular, Plaintiffs' submissions to the Air Force do not include the claim of negligent undertaking.

## Eleventh Defense

To the extent that Plaintiff alleges that the United States is liable in connection with Congress' enactment of any legislation, the FBI's creation or implementation of a national background check system, the promulgation of regulations by the Air Force or the Department of Defense, the Air Force's response to Inspector General recommendations, any federal agency's negligent training or supervision of its employees, or any other discretionary action or inaction subject to policy analysis, the FTCA discretionary-function exception, 28 U.S.C. § 2680(a), bars such claims.

## Twelfth Defense

To the extent that third parties have caused or contributed to the harm for which recovery of damages is sought by Plaintiff, they are Responsible Third Parties within the meaning of Tex. Civ. Prac. & Rem. Code § 33.011(6).  Such Responsible Third Parties may include, but are not

limited to, Devin Patrick Kelley; any unknown person who may have conspired with Devin

Patrick Kelley to commit the criminal act that was the cause of the injuries that are the subject of

the lawsuit; any person or entity that negligently or unlawfully permitted Devin Patrick Kelley to

obtain firearms, body armor, or ammunition utilized in the tragedy at issue, which may include,

but are not limited to, Academy, Ltd., d/b/a Academy Sports & Outdoors and K & L Marketing

Group, Inc., d/b/a Specialty Sports & Supply; and any person or entity with a legal duty to take

action that may have prevented the tragedy at issue or to warn others concerning Devin Patrick

Kelley's conduct. The United States is not liable for the percentage of harm for which those third

parties, or any other responsible third parties that discovery may reveal, are found responsible in

accordance with Tex. Civ. Prac. & Rem. Code § 33.003(a).

**Thirteenth Defense**

As for its thirteenth defense, the defendant United States of America submits the

following responses to the separate paragraphs of the original complaint.

**I. PARTIES**

**1.1**     United States of America ("USA") is a defendant in this action pursuant to 28

U.S.C § 1346 (b) and 28 U.S.C. §§ 2671, et seq., commonly referred to as the Federal Tort

Claims Act, in that the claims which give rise to this action are against, in whole or in part, the

United States of America.

**Response:**

The United States admits that it is a defendant in this action, but denies that any relief is

available to Plaintiff under the Federal Tort Claims Act.

**1.2**     Plaintiff  has complied with the administrative prerequisites regarding filing suit

against Defendant USA in that, on August 27, 2019, Plaintiff served upon Defendant USA

Notices of Claim (Standard Form 95) on behalf of John Porter Holcombe II, as Next Friend of

Minors E.J.H. and P.J.H., and as Independent Administrator of the Estates of Minors G.L.H.,

E.R.H., and M.G.H. and/or on behalf of any individual entitled to recover under the applicable

law, and each Form 95 referenced herein was received by an agency of Defendant USA, namely,

the United States Air Force, on September 9, 2019, and more than six (6) months have elapsed

since receipt by Defendant USA of the Form 95s, and Defendant USA has not taken any action

with respect to the Notices of Claim.

**Response:**

The allegations of paragraph 1.2 are conclusions of law that do not require a response. To

the extent that a response is required, the United States admits that John Porter Holcombe II, as

next of friend of minors E.J.H. and P.J.H., presented administrative claims for $25 million each,

which the Air Force received on September 4, 2019.  The United States further admits that the

Estates of G.L.H., E.R.H., M.G.H., through their independent administrator, Joe Porter

Holcombe II, presented administrative claims for $20 million each, which the Air Force received

on September 4, 2019.  The Air Force did not make a final disposition on the administrative

claims within six months of its filing.

1.3     Accordingly, the within action is timely given that it has been instituted more than

six (6) months after service of the Notices of Claim upon the Air Force, notwithstanding that

Defendant USA has yet to take any action with respect to the Notices of Claim.  A copy of all

five (5) Form 95s filed on behalf of John Porter Holcombe II, as Next Friend of Minors E.J.H.

and P.J.H., and as Independent Administrator of the Estates of Minors G.L.H., E.R.H., and

M.G.H. are attached hereto as **Exhibit 1** and are incorporated herein by reference.[1]

**Response:**

The allegations of paragraph 1.3 are conclusions of law that do not require a response. To the extent that a response is required, the United States incorporates its response to Paragraph 1.2, and admits that the five SF-95s are attached as Exhibit 1 to the Complaint.

**1.4**   Plaintiff John Porter Holcombe II resides in Stockdale, Wilson County, Texas, within the jurisdiction of this Court.

**Response:**

The United States is without sufficient knowledge to admit or deny the allegations of paragraph 1.4 and, therefore, denies them.

**1.5**   Plaintiff John Porter Holcombe II is the surviving legal husband of Crystal Holcombe, deceased.  John Porter Holcombe II is also the surviving stepfather and court-appointed conservator of the surviving minor children of Crystal Holcombe, deceased: E.J.H. and P.J.H.  The Court Order appointing John Porter Holcombe II as conservator of Minors E.J.H. and P.J.H. is attached as **Exhibit 2**.

**Response:**

The United States admits the allegations contained in paragraph 1.5.

**1.6**   Plaintiff John Porter Holcombe II is the legally appointed Independent Administrator of the Estates of Minors G.L.H., E.R.H., AND M.G.H., all of whom are the natural children of Crystal Holcombe, deceased, and all of whom were killed in the shooting. The Court Order appointing John Porter Holcombe II as Independent Administrator of the

---

[1] **Exhibit 1** has been redacted to remove the names and dates of birth of minors in accordance with FRCP 5.2.

Estates of Minors G.L.H., E.R.H., AND M.G.H. is attached as **Exhibit 3**.[2]

**Response:**

The United States admits the allegations contained in paragraph 1.6..

## II. BACKGROUND

**A. Congress passed key legislation to prevent shootings like the Sutherland Springs shooting.**

**2.1** Through several pieces of legislation spanning almost 30 years, Congress acted to block individuals who present a known risk of violence from purchasing firearms. To that end, Congress mandated that certain individuals must be flagged in an instant criminal background check system used by firearms sellers nationwide in the interest of public safety. The Air Force and Department of Defense ignored three statutory mandates that required Devin Kelley's entry into the background check system: his domestic violence conviction, his conviction for a crime punishable by imprisonment for over a year, and his commitment to a mental institution. As a direct result of the Air Force and Department of Defense's failure to flag Kelley in the FBI database, his domestic violence escalated into a murderous shooting rampage targeting his ex-wife's family and neighbors at the Sutherland Springs First Baptist Church on November 5, 2017.

**Response:**

The allegations of the 1st and 2nd sentences of paragraph 2.1 are conclusions of law that do not require a response. To the extent that a response is required, the United States only admits that Congress has enacted legislation that makes it illegal for certain persons to receive or possess firearms, and that requires a federally-licensed firearms dealer to submit certain

---

[2] **Exhibit 3** has been redacted to remove the names of minors and financial information in accordance with FRCP 5.2.

background information of a potential firearms purchaser to the National Instant Background

Check System (NICS) to determine whether the potential purchaser is for any reason disqualified

from receiving or possessing a firearm.  The allegations of the 3rd and 4th sentences are denied.

    **2.2**    Federal law makes it unlawful to sell a firearm to a person whom the seller knows

or has reasonable cause to believe is someone who (a) has been convicted of a misdemeanor

crime of domestic violence; (b) has been convicted of a crime punishable by imprisonment for

longer than a year; or (c) has been committed to any mental institution.  18 U.S.C. § 922(d)(1),

(4), (9).  These categories of individuals are forbidden from possessing firearms.  *Id.* § 922(g).

**Response:**

    The allegations of paragraph 2.2 are conclusions of law that do not require a response.

To the extent that a response is required, the United States admits that the allegations contained

in this paragraph accurately paraphrase portions of 18 U.S.C. § 922.

    **2.3**    Congress attempted to quell the dangers presented by mass shooters like Devin

Kelley before he was even born.  Initially passed as the Gun Control Act of 1968, the law banned

the sale of firearms to those individuals with criminal histories and those individuals who have

been committed to mental institutions.

**Response:**

    The allegations of paragraph 2.3 are conclusions of law that do not require a response.

To the extent that a response is required, the United States admits that the Gun Control Act of

1968, as amended, makes it unlawful for any person to knowingly transfer a firearm to certain

classes of individuals, and also makes it unlawful for such individuals to receive a firearm.

    **2.4**    In 1993, Section 103 of the Brady Handgun Violence Prevention Act required the

Attorney General of the United States to establish an instant criminal background check system

that a firearm seller must use to determine whether the sale of the firearm violates 18 U.S.C. § 922. Under 18 U.S.C. § 922(t), a licensed dealer of firearms shall not sell or transfer to any person without first contacting the national instant criminal background check system.

**Response:**

The allegations of paragraph 2.4 are conclusions of law that do not require a response. To the extent that a response is required, the United States admits that the allegations contained in this paragraph accurately paraphrase § 103 of the Brady Handgun Violence Prevention Act and 18 U.S.C. § 922(t).

**2.5** Congress passed the Brady Bill to prevent shootings just like the Sutherland Springs shooting. When the Brady Bill was introduced in the House, one of the Bill's sponsors explained that express purpose:

> Mr. Speaker, I rise to strongly support today's introduction of the Brady bill. Five years ago, a man named Larry Dale walked into Mercer's Discount Foods in Tulsa, OK, and opened fire on an unsuspecting crowd of shoppers. Dale's rampage killed one person and severely wounded another. Many Oklahomans were outraged to learn that Dale, a convicted felon with a history of mental illness, had walked into a gun store the day before his crime, filled out a single form, and walked out with his instrument of death. The tragedy is that 5 years after Larry Dale proved how flawed the system is, the Brady Bill is not the law of the land.[3]

**Response:**

The allegations of paragraph 2.5 are conclusions of law that do not require a response. To the extent that a response is required, the United States only admits that one of the sponsors of the Brady Bill made the quoted statement contained in this paragraph at the time the bill was introduced in the House of Representatives.

---

[3] Congressional Record, House, at H731 (Feb. 22, 1993).

9

2.6     When the Brady Bill went to committee, the Chairman's opening statement in the House Subcommittee hearings noted that the Brady Bill would effectively prevent barred individuals from purchasing firearms:

> We are meeting today to consider a bill whose time has come-the Brady Handgun Violence Prevention Act.…   There is nothing complicated about this bill. … It will save lives. The Brady bill will save lives that are being wasted in an epidemic of handgun violence from Brooklyn to Florida and all across America. And that is not theory, that is fact.  After Brady passes, a convicted felon will no longer be able to walk into a gun store, as thousands have done this year, and walk out 10 minutes later with a murder weapon. State after State has shown that waiting periods and background checks work.[4]

**Response:**

The allegations of paragraph 2.6 are conclusions of law that do not require a response. To the extent that a response is required, the United States admits that the House Subcommittee Chairman made the quoted statements contained in this paragraph in an opening statement in the House Subcommittee hearings for the Brady Bill.

2.7     The committee issued the House Committee Report.  Under the heading "Summary and Purpose," the committee reported:

> The purpose of H.R. 1025 is to prevent convicted felons and other persons who are barred by law from purchasing guns from licensed gun dealers, manufacturers or importers.

The House report underscored that background checks are necessary to prevent violent offenders from gaining access to firearms:

---

[4] Brady Handgun Violence Protection Act, hearing before the Subcommittee on Crime and Criminal Justice of the House Judiciary Committee (Sept. 30, 1993).

> The experiences of States which require background checks before firearm sales also indicate that many repeat offender criminals buy guns directly from firearms dealers. For example, in California, a background check intercepted 2,500 felons attempting to buy guns from dealers last year. … Each year in Illinois some 3,000 prohibited persons seek to purchase firearms and are denied.[5]

**Response:**

The allegations of paragraph 2.7 are conclusions of law that do not require a response. To the extent that a response is required, the United States only admits that the House Committee Report for the Brady Bill contains the language quoted in this paragraph and that the first quotation appears under the heading "Summary and Purpose."

**2.8**     In 1996, the Domestic Violence Offender Gun Ban, also referred to as the "Lautenberg Amendment," made it unlawful to sell firearms to anyone convicted of a misdemeanor crime of domestic violence.  Congress enacted the Domestic Violence Offender Gun Ban to "close [a] dangerous loophole" in the gun control laws: while felons had long been barred from possessing guns, many perpetrators of domestic violence are convicted only of misdemeanors.[6]

**Response:**

The allegations of paragraph 2.8 are conclusions of law that do not require a response. To the extent that a response is required, the United States only admits that the Domestic Violence Offender Gun Ban is referred to as the "Lautenberg Amendment;" that it amended 18 U.S.C. § 922(g) to include a person convicted of a misdemeanor crime of domestic violence; and

---

[5] H. Rep. No. 103-344, Brady Handgun Violence Prevention Act (Nov. 10, 1993).

[6] *United States v. Castleman*, 134 S. Ct. 1405, 1408–09 (2014) (citing *United States v. Hayes,* 555 U.S. 415, 426 (2009)).

that the quoted language contained in this paragraph is from the case of *United States v. Castleman*.

2.9     In abusive relationships, the severity of domestic violence often increases over time, and the presence of a firearm increases the likelihood of homicide.[7]  Congress recognized that "[f]irearms and domestic strife are a potentially deadly combination."[8]  As one Senator noted during the debate over § 922(g)(9), "[A]ll too often, the only difference between a battered woman and a dead woman is the presence of a gun."  142 Cong. Rec. 22986 (1996) (statement of Sen. Wellstone).

**Response:**

The allegations of the 1st sentence of paragraph 2.9 are irrelevant and immaterial, and no response is required.  The allegations of the 2nd and 3rd sentences are conclusions of law that do not require a response.  To the extent that a response is required, the United States only admits that the language from the 1st sentence, although not placed in quotes above, is taken from the case of *United States v. Castleman*, and that the quotation in the footnote is accurate; that the quoted language contained in the 2nd sentence is taken from the case of *Voisine v. United States*; and that the quoted language contained in the 3rd sentence contains comments Senator Wellstone made during the debate over 18 U.S.C. § 922(a)(9).

**B.      Congress, the Department of Defense, and the Department of Air Force voluntarily undertook a non-delegable duty to report convictions for domestic violence, incarceration for a crime punishable by more than one year, and mental institution commitment.**

---

[7] See *id.,* at 14–15; Campbell et al., Assessing Risk Factors for Intimate Partner Homicide, DOJ, Nat. Institute of Justice J., No. 250, p. 16 (Nov. 2003) ("When a gun was in the house, an abused woman was 6 times more likely than other abused women to be killed").

[8] *See Voisine v. United States*, 136 S. Ct. 2272 (2016) (*citing Hayes,* 555 U.S. at 427).

2.10     Federal law requires Government agencies to report ineligible firearm purchasers to a national database.  Specifically, 34 U.S.C. § 40901(e)(1)(C) states that federal agencies that have "any record of any person demonstrating" that the person should not be able to purchase a gun "shall, not less frequently than quarterly, provide the pertinent information contained in such record to" the Attorney General for the national instant criminal background check system. Section 40901(e)(1)(D) creates an obligation on agencies to correct and update these records.

**Response:**

The allegations of paragraph 2.10 are conclusions of law that require no response.  To the extent a response is required, the United States only admits that the quoted language is taken from 34 U.S.C. § 40901(e)(1)(c), and that such statute  requires federal departments and agencies to provide to the Attorney General no less than quarterly certain information concerning persons falling under 18 U.S.C. § 922(g) and (n).

2.11     Title 10, U.S.C. section 1562 requires that the Department of Defense establish a central database of information on the incidents of domestic violence involving members of the armed forces.  This section also requires that all military departments, including the Department of the Air Force, report domestic violence incidents.

**Response:**

The allegations of paragraph 2.11 are conclusions of law, and are irrelevant and immaterial, and therefore do not require a response.  To the extent that a response is required, the United States only admits that 10 U.S.C. § 1562 reads that the "Secretary of Defense shall establish a central database of information on the incidents of domestic violence involving members of the armed forces" and provides that Secretaries of the military departments have certain incidents of reported domestic violence.

**2.12**    It is Department of Defense policy that all Department agencies, including the Department of the Air Force, comply with the (a) crime reporting requirements of the Uniform Federal Crime Reporting Act of 1988; (b) reporting requirements for victim and witness assistance notifications of the Victim's Rights and Restitution Act of 1990, and (c) reporting requirements of the Brady Handgun Violence Prevention Act.

**Response:**

The allegations of the paragraph 2.12 are conclusions of law that do not require a response.  The allegations of the paragraph 2.12 pertaining to the Uniform Federal Crime Reporting Act of 1988 and the Victim's Rights and Restitution Act of 1990 are irrelevant and immaterial to this action and, therefore, do not require a response.  To the extent that a response is required, the United States admits the Department of Defense has established policies for complying with its reporting obligation to the National Instant Criminal Background Check System, which was created pursuant to the Brady Act.  The United States denies that the Brady Act itself has reporting requirements, but admits that the language contained in the paragraph above is contained in DoD Instruction 7730.47.

**2.13**    To implement these federal laws, the Department of Justice established the National Instant Criminal Background Check System (NICS).  Congress, through the Brady Act, established the NICS Indices, which contains information provided by federal agencies of persons prohibited from receiving firearms under federal law.  The NICS responds instantly to background check inquiries by querying the NICS Indices, the National Crime Information Center, and the Interstate Identification Index.  The Interstate Identification Index contains biometric criminal history based on fingerprint submission.

**Response:**

The United States denies the allegations of the 1st and 2nd sentences of paragraph 2.13. NICS was not implemented to comply with all of the statutes referenced in the prior paragraph and the NICS Indices were implemented pursuant to regulation.  With regard to the 3rd sentence, the United States only admits that NICS responds to background check inquiries by querying the NICS Indices, the National Crime Information Center, and the Interstate Identification Index databases.  With regard to the 4th sentence, the United States only admits that the Interstate Identification Index contains certain biometric criminal history based on fingerprint submissions.

2.14     The Department of Defense issued policies that required submission of fingerprint cards and final disposition reports to the FBI for inclusion in the NICS database.  The Department of Defense and U.S. Air Force promulgated these policies through Department of Defense Instruction 5505.11, "Fingerprint Card and Final Disposition Report Submission Requirements."  Instruction 5505.11 requires the collection fingerprints and the submission criminal history to the FBI.  In addition, final disposition reports must be submitted to the FBI upon final disposition of the offense.

**Response:**

With regard to the allegations in the 1st sentence of paragraph 2.14, the United States only admits that DoD policies required submission of fingerprint cards and final disposition reports to the Interstate Identification Index, which is one of the databases searched by NICS when conducting a background check of a prospective firearm transferee.  With regard to the 2nd sentence, the United States admits that DoD and USAF policies, which are promulgated through DoDI 5505.11, Fingerprint Card and Final Disposition Report Submission Requirements, require all DoD law enforcement agencies to report criminal history to the FBI.  With regard to the 3rd

sentence, the United States only admits that DOD instruction 5505.11 states that "For military subjects . . . the FD-249 shall be submitted when an agent or law enforcement official determines, following coordination with the servicing [Staff Judge Advocate] or legal advisor if necessary . . . that probable cause exists to believe that the person has committed an offense listed in [the instruction]."  With regard to the 4th sentence, the United States only admits that the instruction states that final disposition reports are to be submitted to the FBI upon final disposition of the offense in certain instances.

      **2.15**    Department of Defense Manual 7730.47-M Volume 1, Enclosure 3, prescribes the reporting data elements needed to comply with Federal criminal incident reporting pursuant to federal law.  Enclosure 3 states the Defense Incident-Based Reporting System:

> shall be used to centralize the collection of information that is reportable by the DoD Components pursuant to The Brady Handgun Violence Prevention Act of 1993, which requires the Department of Defense to report these eight categories to the FBI for purposes of prohibiting firearm purchases:
> (1)    Persons who have been convicted in any court of a crime punishable by imprisonment for a term exceeding 1 year. …
> (4) Persons who have been adjudicated as mental defectives or who have been committed to a mental institution. …
> (7) Persons convicted in any court of a misdemeanor crime of domestic violence.

**Response:**

      With regards to the allegations in paragraph 2.15, the United States only admits that the quoted language is taken from enclosure 3 of Department of Defense Manual 7730.47-M, and that manual indicates that the Defense Incident-Based Reporting System shall be used to centralize information reportable to the FBI pursuant to the Brady Act.  However, the United States notes that the quoted language is taken out of context; DoD Manual 7730.47-M, Volume 1, Enclosure 3, does not require the use of DIBRS to report all criminal history information to

NICS, and DoD components with assigned law enforcement agencies or activities utilize other methods to comply with the Brady Handgun Prevention Act, including reporting criminal history information directly into certain federal databases, including the Interstate Identification Index (III).   DoD 7730.47-M, Vol. 1, is not the governing policy for DoD's submission of offender criminal history data to the FBI through the collection and submission of fingerprints and final disposition reports.   The United States moreover denies that it owed any duty actionable under Texas law to the Plaintiff with regard to the reporting requirements of "Department of Defense Manual 7730.47-M Volume 1, Enclosure 3."

   **2.16**    The Department of Air Force issued Instruction 31-206 and 31-118.   Air Force policies required that Air Force Security Forces units obtain complete sets of fingerprints on fingerprint cards.   Air Force Instructions require the submission of these fingerprint cards and final disposition reports to the FBI.   Department of Air Force Instruction 31-205 requires fingerprinting of all post-trial inmates during the in-processing into a confinement facility.   The Instruction also required that Air Force train its staff in in-processing matters, including collecting and submitting fingerprint cards and final disposition reports to the FBI.

**Response:**

   With regard to the allegations of the 1st sentence of paragraph 2.16, the United States only admits that Air Force Instructions 31-206, dated September 16, 2009, was issued and in effect for 6/2011 through 12/2012.   The United States admits that Instruction 31-118 was issued, but denies that it was in effect during times relevant to this litigation.   The allegations of the 2nd and 3rd sentences are conclusions of law that do not require a response.   To the extent a response is required, the United States only admits that paragraph 2.24 of Air Force Instruction 31-206, dated September 16, 2009, was in effect for 6/2011 through 12/2012, and states that "DoD

Instruction 5505.11 requires an FD-249 [fingerprint card] . . . be submitted on all suspects under investigation by [Security Forces] for offenses listed in DoDI 5505.11 . . . only when such offenses are disposed of by court-martial or command action by an Article 15[,]" and that 2.24.1 through 2.24.4 detail the circumstances and times when fingerprint cards and final disposition reports must be submitted to the FBI.  The allegations of the 4th and 5th sentences are conclusions of law that do not require a response.  To the extent a response is required, the United States only admits that Air Force Instruction 31-205, dated April 7, 2004, was in effect for 6/2011 through 12/2012, and that paragraph 5.3.1 of Air Force Instruction 31-205 states that "In-processing [to the Air Force Correction System] . . . includes accomplishing the following: . . . fingerprinting[,]" and that paragraph 2.3 of that instruction discusses the training of confinement officers.

**2.17**     The Department of Air Force also has instructions, handbooks, and manuals that provide policy, guidance, and procedures for collecting and reporting criminal history data to the FBI, consistent with Department of Defense policies.

**Response:**

Because the language of paragraph 2.17 is vague and ambiguous, the United States is without sufficient knowledge to admit or deny the allegations of the paragraph and therefore, denies them.

**2.18**     Air Force Office of Special Investigations Handbook 71-105 ("An Agent's Guide to Conducting and Documenting Investigations," March 9, 2009) obliges Air Force agents or employees to collect a subject's fingerprints (or the electronic equivalent) after a subject interview.  The Handbook requires Detachment leadership to review the fingerprint cards and

final disposition reports for accuracy, verify the fingerprints were acceptable, and document their review.

**Response:**

  With regard to the 1st sentence in  paragraph 2.18, the United States only admits that step 19 of AFOSI Handbook 71-105, dated March 9, 2009, which was in effect for 6/2011 through 12/2012, states that "once the SUBJECT interview is completed or terminated, the case agent must administratively process the SUBJECT by taking fingerprints."  With regard to the 2nd sentence, the United States only admits that step 20 of AFOSI Handbook 71-105 states that "unit leadership must review the fingerprint cards and Forms R-84 and document the review . . . ."

  **2.19** Air Force Office of Special Investigations Manual 71-118, Volume 4, ("General Investigative Methods," April 5, 2012) requires the collection of fingerprints from all subjects of Special Investigations after the subject interview if investigating the subject for violation of certain offenses, including crimes of domestic violence.  It refers Air Force agents to Department of Defense Instruction 5505.11 for the criteria of collecting and submitting fingerprints to the FBI.

**Response:**

  With regard to the 1st sentence of paragraph 2.19, the United States only admits that paragraph 4.7 of AFOSI Manual 71-118, Volume 4, dated April 30, 2009, which was in effect from 6/2011 through 12/2012, states that "All subjects of investigations must be fingerprinted using Federal Document 249 (FD-249) . . . or the appropriate [Investigative Information Management System] application."  With regard to the 2nd sentence, paragraph 4.7 also states that Air Force personnel must "Review criteria and guidance for obtaining and submitting fingerprints . . . in DoD Instruction DoDI 5505.11."

**2.20**     Air Force Office of Special Investigations Manual 71-121 ("Processing and Reporting Investigative Matters," October 12, 2012) requires Air Force agents to submit a subject's fingerprints to the FBI if they have probable cause to believe the subject of their investigation committed certain offenses, including offenses involving domestic violence.  This manual also requires agents to submit completed final disposition reports on military members to the FBI within fifteen (15) days of sentencing.  Duplicates of these reports must be maintained in the Air Force investigative case files.  This manual further requires Detachment leadership to review—for sufficiency—investigative files monthly from the date of the allegation until the case is closed.

**Response:**

All of the allegations of paragraph 2.20 are conclusions of law that do not require a response.  To the extent that a response is required, with regard to the 1st sentence, the United States only admits that paragraph 5.14.2.1 of AFOSI Manual 71-121, dated January 13, 2009, which was in effect for 6/2011 through 12/2012, states "For military members, submit the FD-249 through the Criminal Fingerprint activity to the FBI upon determination, following coordination with the servicing [Staff Judge Advocate] and, as appropriate, civilian prosecutorial authority, that probable cause exists to believe the SUBJECT has committed [certain offenses]."  To the extent that a response is required, with regard to the 2nd sentence, the United States only admits that paragraph 5.14.2.1.1 of AFOSI Manual 71-121 states that "Within 15 calendar days after final disposition of military judicial or nonjudicial proceedings . . . disposition information shall be reported on the R-84, or an electronic data transfer equivalent, if it has not already been reported on an FD-249[,]" and that paragraph 5.14.2.2 states "Submit a completed hard-copy R-84 [disposition form] on military members to the FBI within 15 days after the [Staff Judge

Advocate] notifies you of final military judicial or [non-judicial punishment] disposition."  To the extent that a response is required, with regard to the 3rd sentence, the United States only admits that 5.14.2.2 of AFOSI Manual 71-121 states "Maintain the duplicate R-84 in the [Air Force case file.]"  To the extent that a response is required, with regard to the 4th sentence, the United States only admits that paragraph 4.24.1.3 of AFOSI 71-121 states that "Case File investigations will be reviewed monthly.  This review will occur from the date the allegation or complaint was received until closed . . . ."

C.    **The Department of Defense and Air Force knew that it was not reliably collecting and reporting fingerprints and final disposition information to the FBI.**

      **2.21**    The Department of Defense Inspector General conducted several investigations that found failures in the submission of required fingerprints and final disposition reports to the FBI throughout the Department.

**Response:**

      With regard to the allegations of paragraph 2.21, the United States only admits that several reports were prepared following certain OIG investigations regarding the submissions of fingerprints and final disposition reports to the FBI.  The United States further admits that in connection with these reports, the OIG made certain findings, including that certain agencies of the DoD, to a certain extent, did not make such submissions.  However, the OIG's investigations were limited to reviewing cases covering particular periods of time and reporting obligations pursuant to particular legal requirements.

      **2.22**    In 1997, the Inspector General found a high level of noncompliance by Department of Defense and its agencies.  For example, the Air Force failed to submit fingerprint cards in 38% of its criminal cases and failed to submit final disposition reports in half of its criminal cases.  The Inspector General recommended that the Military Departments and Defense

agencies develop polices and implement procedures to correct these failures and prevent such failures from occurring in the future.  The United States Air Force agreed with the recommendation.

**Response:**

The allegations in paragraph 2.22 are irrelevant, immaterial, and taken out of context, and no response is required.  NICS was not operational until 1998, after this report was issued. To the extent a response is required, with regard to the allegations of the 1st sentence of paragraph 2.22, the United States only admits that Report No. PO 97-003 states in the Summary that "[t]he indicated level of the MCIOs [Military Criminal Investigation Organizations] noncompliance in the submission of fingerprint cards and final dispositions is high and consistent throughout the MCIOs."  With regard to the allegations of the 2nd sentence, the United States only admits that Report No. PO 97-003 states in *Finding A. Compliance with Requirements for Submission of Fingerprint Cards and Final Disposition Reports*, that "[t]he Military Criminal Investigation Organizations (MCIOs) are not consistently submitting FD-249, Suspect Fingerprint Card, and FBI/DOJ Form R-84, Final Disposition Report, to the FBI criminal history data files.  The [Air Force] failed to send FD-249s to the FBI in . . . 38.3 percent [of its cases]."  With regard to the 3rd sentence, the United States only admits that Report No. PO 97-003 states in the Summary of Recommendations that "[w]e recommend that the Military Departments and Defense Agencies law enforcement organizations investigating serious offenses as described in CPM No. 10 develop interim policies and implementing procedures for reporting to the FBI criminal history data files while awaiting a new DoD Instruction."  The United States admits that the report states that the Air Force agreed with the DoD OIG recommendations.

2.23     In 2013, an Inspector General investigation revealed that Defense Departments failed to collect or failed to report 20% of fingerprints in sexual assault cases.  (Report No. DoDIG-2013-091, "Evaluation of Military Criminal Investigative Organizations' Sexual Assault Investigations," July 9, 2013.)  Similarly, in 2014, an Inspector General investigation revealed that Defense Departments failed to collect or submit fingerprints to the FBI in sexual assaults of children.  Also in 2014, the Inspector General found Defense Departments failed to collect and submit fingerprints in child death investigations.   In 2015 and 2017, the Inspector General found that Defense Departments failed to collect or submit fingerprints in investigations of sexual assault.

**Response:**

The allegations in paragraph 2.23 are irrelevant, immaterial, and taken out of context, and no response is required.

2.24     In 2015, the Inspector General issued another report (Report No. DoDIG-2015-081, "Evaluation of Department of Defense Compliance with Criminal History Data Reporting Requirements,") where it found that the Military Services failed to consistently submit fingerprint cards and final disposition reports as required.  For example, the Air Force failed to submit 31% of required fingerprint cards and 32% of final disposition reports.  The Inspector General recommended that Air Force take prompt action to submit missing fingerprint and final disposition reports to the FBI.  The Inspector General also recommended that Air Force take prompt action to ensure submission of fingerprint cards from future criminal investigations and future final dispositions reports.  The Department of Air Force agreed with these recommendations.

**Response:**

The allegations of the 1st sentence of paragraph 2.24 are conclusions of law that do not require a response.  To the extent that a response is required, the United States only admits that in 2015, the DoD IG issued another report (Report No. DoDIG-2015-081, "Evaluation of Department of Defense Compliance with Criminal History Data Reporting Requirements,"), and that in that report, the OIG states that the "evaluated services had an overall fingerprint collection and submission compliance of 72%" and that the "evaluated services had an overall final disposition report collection and submissions compliance rate of 70%." The United States is without sufficient knowledge to admit or deny the allegations of the 2nd sentence and, therefore, denies them.  With regard to the 3rd sentence, the United States only admits that the Report states that the Air Force agreed with [the OIG's] recommendation to "promptly submit the missing 304 fingerprints and 334 final disposition reports to the FBI for inclusion into [the Integrated Automated Fingerprint Identification System]."  With regard to the 4th sentence, the United States only admits that the OIG recommended that the Air force "take prompt action to ensure fingerprints and final disposition reports for future arrestees and convicted offenders conform to DoD Instruction 5505.11, "Fingerprint Card and Final Disposition Report Submission Requirements."  With regard to the 5th sentence, the United States admits that the report states the Air Force agreed with the DoD IG's two recommendations.

2.25   A 2017 review conducted by the Inspector General (Report No. DODIG- 2018-035, "Evaluation of Fingerprint Card and Final Disposition Report Submissions by Military Service Law Enforcement Organizations," December 5, 2017) again determined that the Military Services failed to submit fingerprint cards and final disposition reports as required.

**Response:**

The allegations of paragraph 2.25 are conclusions of law that do not require a response. To the extent that a response is required, the United States only admits that in Report No. DODIG-2018-035, the OIG states that the Military Services, collectively, failed to submit fingerprint cards and final disposition reports to the FBI CJIS for inclusion in the FBI's Next Generation Identification database 24% and 31% of the time, respectively, between January 1, 2015 and December 31, 2016.

### III. DEVIN KELLEY

**A.   The Air Force knew Devin Kelley's violent history.**

**3.1**      Devin Kelley entered the Air Force Delayed Enlistment Program on June 12, 2009.  While enlisting, Kelley lied to the Air Force about using and possessing marijuana.  On January 5, 2010, he recertified his lies about marijuana use and possession when he entered active military service.  On March 5, 2010, Kelley graduated from basic military training.

**Response:**

The United States admits the allegations of the 1st sentence of paragraph 3.1.  With regard to the 2nd and 3rd sentence, the United States only admits that on the Questionnaire for National Security Position and Record of Military Processing (Armed Forces of the United States) signed by Kelley, the boxes next to questions regarding marijuana use and possession were marked "no."  The United States admits the 4th sentence of this paragraph.

**3.2**      On April 14, 2010, the Air Force began training Kelley as a Network Intelligence Analyst, but Kelley had academic issues.  Kelley's military training leaders recommended Kelley for elimination from the course because he did not meet academic standards.  The report also indicated that Kelley had several minor disciplinary infractions.

**Response:**

With regard to the allegations of the 1st sentence of paragraph 3.2, the United States only admits that Kelley began as a Network Intelligence Analyst and that Kelley did not meet academic standards for a Network Intelligence Analysis Apprentice.  With regard to the allegations of the 2nd sentence, the United States admits that Kelley did not meet academic standards for a Network Intelligence Analysis Apprentice and was ultimately eliminated.  The United States admits the allegations of the 3rd paragraph.

**3.3**      On December 16, 2010, the Air Force reassigned Kelley to a traffic management career field.  On January 11, 2011, the Air Force permanently changed Kelley's station to Holloman Air Force Base ("Holloman").  Kelley arrived at Holloman in late April 2011. Between June 19, 2011, and March 20, 2012, he accumulated four Memorandums for Record, four Letters of Counseling, and five Letters of Reprimand.  Kelley's conduct included failure to obey direct orders, creating a hostile work environment, making false statements, and insubordination of a superior officer.  This included a letter of reprimand for lying to his supervisor and for failing to report to his duty station after being ordered to do so.  In other letters, Kelley was warned that his conduct was a criminal act.  In at least three of these letters, the Air Force told Kelley that he had proven that he could not be depended upon.  In at least two of these letters, the Air Force noted that Kelley could not always be trusted and had demonstrated a disregard for the Air Force's core values.  The Air Force warned Kelley that future misconduct would lead to more severe punishment.

**Response:**

With regard to the 1st sentence of paragraph 3.3, the United States only admits that Kelley was reassigned to the Traffic Management Apprentice Course, that he completed that course, and

that Kelley was assigned to Holloman Air Force Base.  With regard to the 2nd sentence, the United States only admits that the Air Force changed Kelley's station to Holloman on January 11, 2011.  With regard to the 3rd sentence, the United States admits that Kelley arrived at Holloman.  With regard to the 4th sentence, the United States admits that between July 2011 and March 2012, four letters of counseling and five letters of reprimand were placed in Devin Kelley's employment file.  With regard to the 5th sentence, the United States admits that the conduct of which Kelley was accused included failure to obey orders, creating a hostile work environment, making false statements, and insubordination of a superior officer.  The United States denies the allegations in the 6th sentence.  With regard to the 7th sentence, the United States admits that in some letters Kelley was advised that the conduct of which he was accused could be criminally prosecuted.  With regard to the 8th sentence, the United States only admits that at least three letters brought Kelley's dependability into question.  With regard to the 9th sentence, the United States only admits that in at least two letters, Kelley was advised that the behavior of which he was accused was inconsistent with Air Force values.  With regard to the 10th sentence, the United States only admits that Kelley was advised that future misconduct would be treated more severely.

**3.4**     In February 2011, Kelley began dating Tessa K. Kelley (neé Loge). Tessa Kelley had a child from a previous marriage.  On April 12, 2011, Devin Kelley and Tessa Kelley married.

**Response:**

The United States admits that Devin Kelley and Tessa Kelley were married on April 12, 2011.  The United States is without sufficient knowledge to admit or deny the remaining allegations of paragraph 3.4 and, therefore, denies them.

3.5     On June 2, 2011, Tessa Kelley took her child to William Beaumont Army Medical Center (a facility owned and operated by an agency of the United States).  A nursing note indicated concern for child abuse or neglect.  While questioning Tessa Kelley about her son's injuries, Tessa Kelley stated that Devin Kelley had kicked her.

**Response:**

The United States admits the allegations contained in the 1st and 2nd sentences of paragraph 3.5.  With regard to the allegations of 3rd sentence, the United States is without sufficient knowledge to admit or deny these allegations and, therefore, denies them.

3.6     On June 8, 2011, Devin and Tessa Kelley took the child to an ER complaining of vomiting and falling.  The physicians noticed the child had bruising on the child's left cheek that "appeared to be fresh and a little purple."  A CT scan revealed a fractured clavicle and subdural hemorrhage (bleeding on the brain).  After the fact, Devin Kelley admitted to the United States Air Force that he caused these injuries without excuse or justification.  Devin Kelley produced a video confessing to his wrongful conduct.  Physicians notified the Children, Youth and Families Department in New Mexico, who, in turn, notified the Air Force Office of Special Investigations Detachment 225 at Holloman of the possible child abuse.

**Response:**

With regard to the allegations of the 1st, 2nd, and 3rd sentences of paragraph 3.6, the United States is without sufficient knowledge to admit or deny these allegations and, therefore, denies them.  With regard to the allegations of the 4th sentence, the United States only admits that, in connection with the court-martial proceeding against him, Devin Kelley stipulated that he "slapped [J.L.] with enough force that [J.L.] fell over on his side[,] that 'The slap caused three bruises marks to the left side of [J.L.'s] face and bruising to his ear[,]' that photographs marked

as exhibits by the prosecution that were taken on June 9 and 12, 2011, reflected that bruising[,]" and that "[Kelley] had no legal justification or excuse for his actions[.]"  With regard to the allegations of the 5th sentence, the United States admits that Kelley stipulated that a "video [marked as an exhibit by the prosecution] is a video of [Kelley] confessing to physically abusing [J.L.] on 27 April 2012."  With regard to the allegations of the 6th sentence, the United States only admits that the Air Force Office of Special Investigations Detachment 225 at Holloman was notified of possible child abuse.  The United States is without knowledge to admit or deny the remaining allegations and, therefore, denies them.

3.7     On June 9, 2011, Air Force Special Investigations opened an investigation for assault on a child, listing Devin Kelley as the subject.  They interviewed Kelley that day.  Kelley denied striking his stepson and denied having any knowledge of Tessa Kelley striking the son. Kelley stated that he and Tessa Kelley were the only ones with direct access to his stepson. Kelley claimed he did not know how his stepson received the injury to his head.  Kelley suggested that his stepson received the injury from falling on the floor while crawling or playing in his crib.  At the end of the interview, agents collected Kelley's fingerprints and released him to his unit representatives.  Air Force agents collected Kelley's fingerprints because they believed probable cause existed that Kelley committed the assault on his stepson.  However, Air Force agents did not send Kelley's fingerprint cards to the FBI, as required by policy.

**Response:**

The United States admits the allegations contained in the 1st through 7th sentences of paragraph 3.7.  With regard to the allegations of the 8th sentence, the United only admits that Air Force agents collected Kelley's fingerprints and that AFOSI Special Agents involved in this interview told DoD OIG investigators that they believed there was probable cause to believe that

Kelley committed the assault on his stepson when they interviewed him. The allegations of the 9th sentence are conclusions of law that do not require a response. To the extent that a response is required, the United States admits that Kelley's fingerprint cards were sent to the FBI prior to the tragic events at issue in this litigation, but denies that any information was required to be sent to the FBI at the time of the interview.

      **3.8**     On June 24, 2011, Kelley's stepson was placed in foster care because of unexplained injuries and the suspicions of child abuse. Also on that day, Tessa Kelley reported that Kelley had physically assaulted her by grabbing her around the throat, choking her, and throwing her against a wall. This report was provided to Air Force Reserve leadership and to the 49th Security Forces Squadron at Holloman Air Force Base. The Air Force report of the incident stated that the investigation "determined no crime had been committed and there was no evidence of any injuries to either party."

**Response:**

      With regard to the allegations of the 1st sentence of paragraph 3.8, the United States is without knowledge to admit or deny these allegations and, therefore, denies them. The United States denies the allegations of the 2nd through 4th sentences of this paragraph.

      **3.9**     On September 7, 2011, Kelley voluntarily went to the Holloman Mental Health Clinic as a walk-in patient and stated that he was unable to cope with the stress he was under at work. He stated that Child Protective Services was removing his stepson from the house due to an allegation of abuse caused his stress. Kelley also stated that his supervisor was constantly "yelling at work." A staff psychologist wrote in Kelley's mental health record that treatment would concentrate on his "anxiety/attention/occupational; continue to develop relational and mood management coping skills." The psychologist also wrote that Kelley would be seen

weekly.  Between September 7, 2011, and February 22, 2012, Kelley was treated 17 times at the

Holloman Mental Health Clinic.  During this time, Kelley was prescribed Atomoxetine,

Ibuprofen, Albuterol, Fluticasone, and Omeprazole.

**Response:**

       With regard to the allegations of the 1st sentence of paragraph 3.9, the United States only

admits that Kelley voluntarily went to the Holloman Mental Health Clinic as a walk-in patient on

September 7, 2011.  With regard to the 2nd sentence, the United States only admits that the

medical note for the visit of September 7, 2011, states "stepson taken away" and "YFD custody."

With regard to the 3rd sentence, the United States only admits that the same medical note states

"yelling at work."  The United States admits the allegations contained in the 4th sentence of this

paragraph.  With regard to the 5th sentence, the United States only admits that the medical note

for the visit of September 7, 2011, states "[Kelley] to continue with this provider for weekly

individual counseling."  The United States admits the allegations contained in the 6th and 7th

sentences.

       **3.10**    In a report on Kelley's October 11, 2011, visit, a psychologist wrote that Kelley

had difficulty interacting with authority figures and that he perceived that they were criticizing

him.  On January 10, 2012, the psychologist examined Kelley again and reported that Kelley was

"able to attend to and focus on pertinent material at home and work."  The psychologist also

wrote that Kelley was able to "control and direct his energy appropriately" and that there were

"no significant changes in [his] symptoms."

**Response:**

       With regard to the allegations of the 1st sentence of paragraph 3.10, the United States

only admits that a medical note for an October 11, 2011 visit states that "[Kelley] reported

continued difficult interactions with authority figures where [Kelley] perceives figures motivation as critizing [*sic*] . . . him."  With regard to the 2nd sentence, the United States only admits that a medical note for a January 10, 2012 visit states that "[Kelley] reported he is able to attend to and focus on pertinent material at home and work."  With regard to the 3rd sentence, the United States only admits that the same medical note states that "[Kelley] related he is able to control and direct his energy appropriately[]" and that "[Kelley is] reporting no significant changes in symptoms[.]"

     **3.11**    On February 17, 2012, Tessa Kelley called the 49th Security Forces Squadron to report that Kelley had abused her after fleeing to El Paso, Texas.  Tessa Kelley told Air Force 49th Logistics Readiness Squadron First Sergeant that Kelley's actions caused her to fear for her life.  In response, the First Sergeant told her that the Squadron Commander would issue Kelley a no contact order.  Tessa Kelley told the Squadron investigators that the reason she left Kelley was to get away from him "and the abuse," that Kelley had been physically abusing her since July 2011 and that Kelley had choked her on multiple occasions.   She stated that in one instance on December 24, 2011, Kelley pushed her against a wall and choked her because she had told him that she did not want to visit his family and stated, "You better pack your bags or I'll choke you to the ceiling and pass you out."  Tessa Kelley also said that on another occasion, she and Kelley argued over her wanting to go for a walk at night.  This argument resulted in Kelley choking her, kicking her in the stomach, and then dragging her by her hair into the bathroom.  She said that Kelley told her "I'm going to water-board you" and stuck her head directly under the showerhead.  Tessa Kelley also told the investigators that Kelley emotionally and physically abused her throughout their marriage.  Tessa Kelley provided other examples of abuse, stating that Kelley would threaten to choke her if she did not do as he said, and would slap her, kick her,

pull her hair, drag her through their house, and control her.  She stated that Kelley told her if she "said anything to anybody he would bury her in the desert somewhere."  Tessa Kelley stated that the reason she had not reported the abuse sooner was due to fear for both her life and the life of her son.

**Response:**

The United States admits the allegations contained in the 1st, 2nd, and 3rd sentences of paragraph 3.11.  With regard to the allegations in the 4th sentence, the United States admits that Tessa Kelley provided a signed written statement on February 17, 2012, in which she stated that the first abuse from Kelley occurred in July 2011, and that he had choked her on multiple occasions.  With regard to the allegations in the 5th sentence, the United States only admits that in that same written statement, Tessa Kelley stated that on December 24, 2011, Kelley pushed her against a wall and choked her because she did not want to spend Christmas with his family, and stated to her "You better pack your bags or I'll choke you to the ceiling and pass you out." The United States admits the allegations contained in the 6th sentence.  With regard to the 7th sentence, the United States only admits that in that same written statement, Tessa Kelley stated that the argument resulted in Kelley choking her, kicking her in the stomach, and then dragging her by her hair into the bathroom.  With regard to the allegations in the 8th sentence, the United States only admits that in that same written statement, Tessa Kelley stated that Kelley told her "I'm going to water-board you," and stuck her under the showerhead.  With regard to the allegations in the 9th sentence, the United States only admits that in that same written statement, Tessa Kelley described Kelley's conduct as physical abuse and verbal abuse.  With regard to the allegations in the 10th sentence, the United States only admits that in that same written statement,

Tessa Kelley stated Kelley slapped her, kicked her, pulled her hair, dragged her, and controlled her.  The United States denies the allegations in the 11th and 12th sentences.

3.12    On February 12, 2012, Air Force investigators tried to interview Devin Kelley as a subject of their investigation into crimes of domestic violence.  Kelley requested legal counsel and did not make a statement.  The 49th Security Forces Squadron did not collect his fingerprints.  Department of Defense and Air Force policies required the collection and submission of fingerprint cards to the FBI.

**Response:**

With regard to the 1st sentence of paragraph 3.12, the United States only admits that on February 17, 2012, Air Force interviewed Devin Kelley as a subject concerning allegations made by Tessa Kelley.  The United States admits the allegations in the 2nd sentence.  With regard to the 3rd sentence, the United States is without knowledge to admit or deny these allegations and, therefore, denies them.  The allegations contained in the 4th sentence are conclusions of law that do not require a response.  To the extent that a response is required, the United States incorporates its response to paragraph 2.16.

3.13    On February 21, 2012, Devin Kelley voluntarily went to the Holloman Mental Health Clinic as a walk-in patient.  He told the staff psychologist that he was upset because his wife left him and because he believed that she told the 49th Security Forces Squadron that he assaulted her.  On February 22, 2012, Kelley returned to the Clinic because he was still upset that his wife left him.  A licensed clinical social worker stated that Kelley told her "he would like to go to the psychiatric hospital for help because he did not believe he could help himself on an outpatient status."

**Response:**

The United States admits the allegations contained in the 1st sentence of paragraph 3.13. With regard to the 2nd sentence, the medical note for a February 21, 2012 visit states that "[Kelley] . . . walked in upset about his wife leaving him on 17 Feb 2012 and the [First Sergeant]. . . taking out a no-contact order for the two, apparently on the basis of what the wife alleged ('assaulted')." With regard to the 3rd sentence, the United States only admits that on February 22, 2012, Kelley reported to clinic staff that he had returned to the Clinic because he was still upset that his wife left him. The United States admits the allegations contained in the 4th sentence of this paragraph.

    **3.14**    On February 23, 2012, Kelley voluntarily entered in-patient care at the Peak Behavioral Health Services ("Peak"), where he remained until March 8, 2012. Peak is a mental health institution. During Kelley's intake evaluation, staff diagnosed him as having "an adjustment disorder with depressed mood." The staff wrote, "The patient reported feeling suicidal with a plan to shoot himself with a gun after his wife informed him that she was filing assault charges for an altercation that occurred three weeks prior to admission." Kelley told the Peak personnel that he had frequent mood swings. Kelley also reported that he had severe anxiety. Kelley told a clinical nurse specialist that he was diagnosed with Attention Deficit Hyperactivity Disorder while he was in the fourth grade. He also told the staff that the Holloman Mental Health Clinic had counseled him to help him cope with his Child Protective Services case, his marital problems, and his alleged emotional abuse from a female supervisor at work. During Kelley's in-patient treatment, he was prescribed Strattera for Attention Deficit Hyperactivity Disorder, Wellbutrin for depression, Clonazepam for anxiety, and Ambien for insomnia.

**Response:**

The United States admits the allegations contained in the 1st and 2nd sentences of paragraph 3.14.  With regard to the allegations of the 3rd through 9th sentences of this paragraph, the United States is without knowledge to admit or deny these allegations and, therefore, denies them.

**3.15**      On March 8, 2012, the Peak discharged Kelley and told him to follow up with the Holloman Mental Health Clinic.  Between March 14, 2012, and April 26, 2012, Kelley was seen at the Clinic seven times.  The Clinic had access to Kelley's records at Peak.  The last visit to the Clinic was April 26, 2012, during which Kelley told Clinic personnel that he was experiencing more difficulty than ever before because the final hearing for the adoption of his stepson was one hearing away from resolution.

**Response:**

With regard to the allegations of the 1st sentence of paragraph 3.15, the United States only admits that Peak discharged Kelley.  The United States admits the allegations in the 2nd sentence.  The United States denies the allegations in the 3rd sentence.  The United States admits the allegations in the 4th sentence.

**3.16**      In approximately mid-March 2012, while at their residence, Tessa Kelley watched as Kelley put one bullet in a .38 Special revolver.  Kelley then pointed the gun at his own head and pulled the trigger three times.  Kelley then pointed the gun at Tessa Kelley and threatened her.  On approximately April 23, 2012, while Tessa Kelley and Kelley were driving to El Paso, Tessa Kelley asked Kelley to slow down.  Devin Kelley cursed at her and told her "don't tell me how to drive." The police later pulled Kelley over and cited him for speeding.  After receiving the ticket and continuing to drive, Kelley blamed the ticket on Tessa Kelley and pulled the car

over again.  Devin Kelley then pulled out a gun and placed the muzzle of the weapon against her

temple, stating, "Do you want to die?"  Tessa Kelley pushed the gun away and began to cry.

Kelley then put the gun in his mouth and asked her why she wanted to be with him. Kelley then

told her that he had slapped her son on June 8, 2011, the day her son was taken to the hospital.

Kelley additionally stated that he had struck his stepson on multiple occasions, the first time

being in March 2011, in New Braunfels.  The Air Force became aware of these facts through

Tessa Kelley in an interview the Office of Special Investigations conducted on May 3, 2012.

**Response:**

     With regard to the allegations in the 1st through 3rd sentences of paragraph 3.16, the

United States only admits that Tessa Kelley testified as to these statements at the Article 32

hearing on August 8, 2012.  With regard to the 4th sentence, the United States only admits that in

a signed written statement dated May 3, 2012, provided to the 49th Security Forces Squadron,

Tessa Kelley stated that on April 23, 2012, while Tessa Kelley and Kelley were driving to El

Paso, Tessa Kelley told Kelley to stop speeding.  With regard to the 5th sentence, the United

States admits that in that same written statement, Tessa Kelley stated that Devin Kelley replied to

her "don't tell me how to drive."  With regard to the 6th sentence, the United States admits that in

that same written statement, Tessa Kelley stated that the police later pulled Kelley over and cited

him for speeding.  With regard to the 7th sentence, the United States admits that in that same

written statement, Tessa Kelley stated that Kelley blamed the ticket on her.  With regard to the

8th sentence, the United States admits that in that same written statement, Tessa Kelley stated that

Kelley pulled out a gun from his holster, placed the gun on her left temple, and stated "Do you

want to die?"  With regard to the 9th sentence, in that same written statement, the United States

admits that Tessa Kelley stated that she pushed the gun away, Kelley then put the gun in his

mouth, and she began to cry.  With regard to the 10th sentence, the United States admits that in

that same written statement, Tessa Kelley stated that Kelley asked her why she wanted to be with

him.  With regard to the 11th sentence, the United States admits that in that same written

statement, Tessa Kelley stated that Kelley then told her "the day we left the hospital, I slapped

[J.L.]."  With regard to the 12th sentence, the United States admits that in that same written

statement, Tessa Kelley stated that Kelley told her he slapped [J.L.] on multiple occasions.  With

regard to the 13th sentence, the United States admits that the Office of Special Investigations

interviewed Tessa Kelley on May 3, 2012.

    **3.17**    On April 27, 2012, Tessa Kelley convinced Devin Kelley to make a full video

confession.  In the video, he admitted to hitting her son multiple times in frustration.  Kelley

stated that this frustration would lead him to push, strike, and slap his stepson.  Kelley also

acknowledged that he caused the bruising on his stepson's face on June 8, 2011.  Kelley further

admitted that he caused his stepson's skull injury.  He stated that he had pushed his stepson down

multiple times and shook him on at least two occasions.  After completing the video, he gave it

to Tessa Kelley.  On April 29, 2012, Tessa Kelley provided the recording of Kelley's confession

to his First Sergeant.  The First Sergeant provided the recording to Air Force Office of Special

Investigations.

**Response:**

    The United States is without sufficient knowledge to admit or deny the allegations of the

1st sentence of paragraph 3.17, and, therefore, denies them.  With regard to the 2nd sentence, the

United States only admits that Devin Kelley appears in a video in which he states that he hit

[J.L.], and that he would get frustrated with [J.L.]  With regard to the 3rd sentence, the United

States admits that in that same video, Kelley states that he would push and slap [J.L.].  With

regard to the 4th sentence, the United States only admits that in that same video, Kelley states that he caused a bruise on the side of [J.L.'s] face. The United States denies the allegations in the 5th sentence. With regard to the 6th sentence, the United States admits that in that same video, Kelley states that he pushed multiple times and shook [J.L.] twice. With regard to the 7th sentence, the United States is without sufficient knowledge to admit or deny the allegations and, therefore, denies them. The United States admits the allegations in the 8th and 9th sentences.

**B.    The Air Force commits Devin Kelley to a mental health facility.**

**3.18**    On April 29, 2012, Kelley's chain-of-command arranged to have him admitted back into the Peak Behavioral Health Services. On April 30, 2012, Kelley entered Peak a second time. Kelley stated that he was going to shoot himself and Peak staff put a high-risk notification alert on his chart due to his homicidal and suicidal indicator.

**Response:**

The United States denies the allegations contained in the 1st sentence of paragraph 3.18. With regard to the allegations of the 2nd sentence, the United States only admits that Kelley voluntarily returned to Peak on April 30, 2012. With regard to the 3rd sentence, the United States is without sufficient knowledge to admit or deny the allegations and, therefore, denies them.

**3.19**    On May 3, 2012, Air Force agents re-interviewed Tessa Kelley. She stated that she thought Kelley might have hurt her son, but she had not seen him do anything to hurt her son. She stated that she began suspecting him of "injuring" her son when Kelley started physically, verbally, and mentally abusing her. Tessa Kelley stated that Kelley had struck, kicked, choked, and pulled her hair out on multiple occasions. She stated that Kelley threatened to kill her if she ever reported the abuse to police, or any other party. Additionally, Kelley had stated to her, "If the cops show up at my door, I will shoot them." She also said that he had told her, "My work is

so lucky I do not have a shotgun because I would go in there and shoot everyone." Tessa Kelley said that on one occasion while driving, Kelley struck her in the stomach in front of two friends, threatening to beat her if she continued speaking. In a separate interview of other witnesses, Air Force investigators discovered that other individuals had witnessed Kelley verbally abuse Tessa Kelley on multiple occasions. In an interview of Tessa Kelley's childhood friend, he stated that Tessa Kelley told him about "all of the times" Kelley abused her. Tessa Kelley included the details of how Kelley would "hit her in the stomach and pull her hair out" and how he attempted to "water board" her. Tessa Kelley told her childhood friend that water boarding consisted of Kelley pushing her head under the shower faucet and turning on the water.

**Response:**

With regard to the allegations of the 1st sentence of paragraph 3.19, the United States admits that Air Force agents interviewed Tessa Kelley on May 3, 2012. With regard to the 2nd sentence, the United States admits that in a signed statement dated May 3, 2012, Tessa Kelley stated that she was suspicious that Kelley had hurt [J.L.], but did not have proof that Kelley hurt [J.L.]. With regard to the 3rd sentence, the United States is without sufficient knowledge to admit or deny the allegations and, therefore, denies them. With regard to the 4th sentence, the United States admits that in a signed statement dated May 3, 2012, Tessa Kelley stated that Kelley had kicked and choked her. With regard to the 5th through 8th sentences, the United States is without sufficient knowledge to admit or deny the allegations and, therefore, denies them. With regard to the 9th sentence, the United States admits that in sworn written statement provided by a person claiming to be Tessa Kelley's childhood friend, that person stated that Tessa Kelley told him about "all of the times" Kelley abused her. With regard to the 10th sentence, the United States admits that in a sworn written statement provided by a person claiming to be Tessa Kelley's

childhood friend, this person stated that Tessa Kelley told him "how [Kelley] would hit her in the stomach . . . and pull her hair out" and "tried to waterboard her." With regard to the 11th sentence, the United States admits that in an interview by an Air Force investigator, that same person "described the water board method as [Kelley] pushing [Tessa Kelley's] head under the shower faucet and turning on the water."

**3.20**     On June 6, 2012, a Peak staff member discovered Kelley's interest in guns. His medical records note that Kelley's insight and judgment are so impaired that Kelley does not understand "how that does not look good on him."

**Response:**

The United States is without sufficient knowledge to admit or deny the allegations of paragraph 3.20 and, therefore, denies them.

**3.21**     While receiving inpatient care at Peak, Mr. Kelley made several threats that if he were picked up by Security Forces, he would go for their guns. While at Peak, Devin Kelley tried to obtain firearms and conducted research into body armor. Mr. Kelley was trying to carry out threats he made against his chain of command. He made these plans to purchase another firearm because his other weapons had been confiscated by the Air Force, its agents, or contractors.

**Response:**

The United States is without sufficient knowledge to admit or deny the allegations of the 1st through 3rd sentences of paragraph 3.21 and, therefore, denies them. With regard to the 4th sentence, the United States only admits that Kelley's weapons had been confiscated by the Air Force; the United States is without sufficient knowledge to admit or deny the remaining allegations and, therefore, denies them.

**3.22**    On June 7, 2012, Kelley left the Peak facility without permission from the staff and without notifying anyone.  On June 8, 2012, a Peak Director located Kelley at a Greyhound bus station in El Paso.  A Greyhound security officer and an El Paso police officer handcuffed him, and police officers from the Sunland Police Department transported him back to Peak.  Kelley did not voluntarily return to Peak but was involuntarily re-committed to Peak.  On the same day, Kelley's Commander prepared a pretrial confinement package.  The package included a memorandum stating that Kelley's Commander was "convinced" that Kelley was "dangerous and likely to harm someone if released."  Kelley's Commander also cited Kelley's Internet search for body armor and firearms as further justification for the pretrial confinement.  The Commander concluded that Kelley was a flight risk and ordered him into pretrial confinement.

**Response:**

With regard to the allegations of the 1st sentence of paragraph 3.22, the United States only admits that on June 7, 2012, Kelley eloped from Peak by jumping a fence.  With regard to the allegations of the 2nd and 3rd sentences, the United States only admits that Kelley was found by Texas state law-enforcement authorities and returned to Peak.  The United States denies the allegations of the 4th sentence.  With regard to the allegations of the 5th sentence, United States only admits that there is pretrial memorandum concerning confinement of Kelley that is dated June 8, 2012.  The United States admits the allegations contained in the 6th sentence.  With regard to the allegations of the 7th sentence, United States only admits that Kelley's Commander cited Kelley's internet search for body armor as further justification for the pretrial confinement.  The United States admits the allegations contained in the 8th sentence.

**3.23**    So, the 49th Security Forces Squadron detained Kelley at Peak and transported him to the 49th Security Forces Squadron Confinement Facility.  Because Kelley was ordered

into pretrial confinement, Air Force policy required the confinement facility personnel to fingerprint Kelley during the in-processing into the confinement facility and to submit those records to the FBI after sentencing. Air Force agents or employees did not take Kelley's fingerprints at this time.  If fingerprints were taken, Air Force agents or employees did not retain those fingerprints as required by policy.  Further, if fingerprints were taken, Air Force agents or employees did not submit fingerprints to the FBI after his sentencing, as required.

**Response:**

With regard to the allegations of the 1st sentence of paragraph 3.23, the United States admits that the 49th Security Forces Squadron transported Kelley from Peak to the 49th Security Forces Squadron Confinement Facility.  The allegations of the 2nd and 5th sentences are conclusions of law that do not require a response.  To the extent that a response is required, the United States incorporates its response to paragraph 2.16.  With regard to the 3rd and 4th sentences, the United States only admits that it is not aware of any evidence that Kelley's fingerprints were collected in connection with in-processing or that fingerprints were submitted to the FBI after his sentencing and before the tragic events at issue in this litigation.

C.    **The Air Force charges and convicts Devin Kelley of domestic violence, resulting in his incarceration for a crime punishable by more than one year.**

**3.24**    On June 8, 2012, Air Force investigators interviewed Kelley about Tessa Kelley's assault allegations and his Absent without Leave status when he left Peak.  Kelley told them that "something tragic had happened and he wanted to kill himself."  Kelley also told the agents that he "escaped" from Peak because he was planning to go to New Braunfels, to plan his suicide. Kelley told agents that he made a confession video "on his own free will."  Because Air Force Detachment 225 Special Agents were in possession of Kelley's confession, conducted a subject interview, and Kelley was ordered into pretrial confinement, Department of Defense policy

required the Special Agents to collect and submit Kelley's fingerprints to the FBI. Kelley's Commander ordered Kelley into pretrial confinement on June 8, 2012, stating that he had "reasonable grounds to believe" Kelley assaulted Tessa and her son. In a memorandum dated June 10, 2012, the Pretrial Confinement Review Officer found that "adequate probable cause" existed to believe Kelley had assaulted Tessa and her son. Yet, Air Force failed to collect or submit Kelley's fingerprints.

**Response:**

The United States admits the allegations contained in the 1st through 4th sentences of paragraph 3.24. The allegations of the 5th sentence are conclusions of law that do not require a response. To the extent that a response is required, the United States incorporates its response to paragraphs 2.14, 2.18, 2.19 and 2.20. The United States admits the allegations in the 6th and 7th sentences. With regard to the 8th sentence, the United States only admits that Kelley's fingerprints were not collected at this time and that his fingerprints were not submitted to the FBI at a later time prior to the tragic events at issue in this litigation.

**3.25** A Pretrial Confinement Memorandum, dated June 8, 2012, concluded that Kelley had violated the Uniform Code of Military Justice: Article 86, Date of Offense, June 7, 2012, Description of Offense, Absence without leave; Article 128, Date of Offense June 9, 2011, Description of Offense, Assault on a Child; Article 134, Date of Offense, April 23, 2012, Description of Offense, Communication of a Threat; and Article 134, Date of Offense, April 23, 2012, Description of Offense, Assault.

**Response:**

The United States only admits that a Pretrial Confinement Memorandum, dated June 8, 2012, stated that there were "reasonable grounds to believe" that Kelley committed the offenses

listed in paragraph 3.25.  The United States denies the remaining allegations contained in

paragraph 3.25.

      **3.26**    On July 10, 2012, the Air Force determined that Devin Kelley should be confined

while awaiting trial because "it is foreseeable that [Kelley] will not appear for trial and/or will

engage in serious criminal misconduct."  As a basis for this conclusion, the Air Force noted:

> The Evidence shows a serious escalation of behavior involving
> firearms and threats after the physical abuse of a child.  Particularly
> alarming is his decision to try to obtain another firearm while
> undergoing inpatient mental health care, conducting research on
> body armor, and then escaping from the facility late at night without
> authorization….
>
> Lesser forms of restraint are inadequate to mitigate the flight risk he
> poses nor would they prevent him from carrying out the threats that
> he has made against others, especially given the forethought and
> planning that he showed by attempting to purchase another firearm
> and his escape from the mental health facility.

**Response:**

      The United States admits that the language quoted in paragraph 3.26 is contained in

memorandum concerning Kelley's confinement dated June 10, 2012.  The United States denies

that the date of the memorandum quoted is July 10, 2012.

      **3.27**    On July 26, 2012, the Air Force charged Kelley with suspected violations of

Article 128 (Assault), against Tessa Kelley and her son.  This is a charge of a crime of domestic

violence.  On August 2, 2012, an Article 32 hearing was conducted.  An Article 32 hearing is a

preliminary hearing that determines whether there is probable cause to believe an offense has

been committed and the accused committed the offense; determines if the convening authority

has court-martial jurisdiction; considers the form of charges; and recommends the disposition of

the case.  The hearing presented evidence that Kelley had abused Tessa Kelley from June 2011

through April 2012.  The medical evidence presented during the hearing indicated her son

suffered severe injuries inflicted by Kelley.  The Article 32 Investigating Officer found reasonable grounds existed to believe that Kelley committed the offenses alleged.

**Response:**

With regard to the allegations contained in the 1st sentence of paragraph 3.27, the United States admits that a charge sheet dated July 26, 2012, listed charges against Kelley, including suspected violations of Article 128 (Assault) against Tessa Kelley and her son.  The allegations of the 2nd sentence are conclusions of law that do not require a response.  To the extent that a response is required, the United States only admits that the Staff Judge Advocate's General Court-Martial Order No. 10, dated January 14, 2013, listed Kelley's conviction and sentence, and that it has a notation at the top of the order, which states "Crime of Domestic Violence. 18 U.S.C. §922(g) (9)."  The United States admits the allegations contained in the 3rd sentence. The allegations of the 4th sentence are conclusions of law that do not require a response.  To the extent that a response is required, the United States only admits that the allegations accurately paraphrase the purpose of an Article 32 hearing.  With regard to the 5th sentence, the United States admits that testimony that Kelley had abused Tessa Kelley at times including in June 2011 and April 2012 was presented at the hearing.  With regard to the 6th sentence, the United States admits that the Article 32 Officer found that "the medical evidence indicates that [J.L.] had both a brain bleed and a broken clavicle, and [Airman First Class] Kelley admitted to abusing [J.L.]." With regard to the 7th sentence, the United States admits that the report of the Article 32 Investigating Officer stated that reasonable grounds existed to believe that Kelley committed the offenses alleged in connection with the Article 32 hearing.

**3.28**     On August 15, 2012, Kelley was also charged with a suspected violation of Article 128 (Assault) for threatening Tessa Kelley with a firearm.  This a crime of domestic violence and a crime punishable by imprisonment for a term exceeding one year.

**Response:**

With regard to the allegations contained in the 1st sentence of paragraph 3.28, the United States admits that a charge sheet dated August 15, 2012, listed charges against Kelley, including a suspected violation of Article 128 (Assault) for threatening Tessa Kelley with a firearm.  The allegations of the 2nd sentence are conclusions of law that do not require a response.  To the extent that a response is required, the United States only admits that the Staff Judge Advocate's General Court-Martial Order No. 10, dated January 14, 2013, listed Kelley's conviction and sentence and it has a notation at the top of the order, stating "Crime of Domestic Violence.  18 U.S.C. §922(g)(9)" and that certain types of assaults under Article 128 (Assault) are punishable by imprisonment for a term exceeding one year.

**3.29**     On August 27, 2012, charges were referred to court-martial.  Kelley remained in confinement until the court-martial trial on November 6, 2012.

**Response:**

Admitted.

**3.30**     On November 3, 2012, trial counsel offered, and the Staff Judge Advocate presented, Kelley and his defense counsel with an Offer for Pretrial Agreement.  The agreement specified that, in return for Kelley's plea of guilty to the charges of assault against his wife and stepson, the firearm charge would be dismissed, and his confinement would not exceed 3 years. On November 4, 2012, Kelley and his defense counsel agreed to the terms of this agreement.

**Response:**

With regard to the allegations of the 1st sentence of paragraph 3.30, the United States admits that there is an Offer for Pretrial Agreement dated November 3, 2012.  With regard to the 2nd sentence, the United States admits that the Agreement states that Kelley would plead guilty to two violations of Article 128, related to assaults upon Tessa Kelley and [J.L.], that the prosecution would dismiss the lesser assault charges, the assault charges involving the use of a firearm, and that "The approved sentence to confinement will not exceed three (3) years."  With regard to the 3rd sentence, the United States admits that Kelley and his defense counsel signed the Agreement and that those signatures are dated November 4, 2012.

**3.31**     On November 6, 2012, in accordance with the pretrial agreement, Kelley pleaded guilty in the General Court-Martial proceedings to assault on his wife and stepson.  On November 7, 2012, the Court-Martial panel sentenced Kelley to a reduction in rank to Airman Basic, confinement for 12 months, and a Bad Conduct Discharge.  The plea of guilty to assault on his wife and stepson was a crime of domestic violence and a crime punishable by imprisonment for a term exceeding one year.  In fact, Kelley's maximum sentence for the assaults on his wife and stepson included potential confinement for 5 years and 6 months.

**Response:**

The United States admits the allegations of the 1st and 2nd sentences of paragraph 3.31. The allegations of the 3rd sentence are conclusions of law that do not require a response.  To the extent that a response is required, the United States only admits that the Staff Judge Advocate's General Court-Martial Order No. 10, dated January 14, 2013, listed Kelley's conviction and sentence, and that it has a notation at the top of the order, which states "Crime of Domestic Violence. 18 U.S.C. §922(g) (9)[,]" and that Article 128 (Assault) is punishable by imprisonment for a term exceeding one year under certain circumstances.  The allegations of the 4th sentence

are conclusions of law that do not require a response.  To the extent that a response is required, the United States admits that the maximum punishment based on Kelley's guilty plea was a term of imprisonment of five years and six months.

  **3.32** The Air Force General Court Martial Order No. 10 specifically noted at the top of the order that this was a "Crime of Domestic Violence. 18 U.S.C. § 922(g)(9)."  The citation to section 922(g)(9) references the federal law that prevents individuals convicted of even a misdemeanor crime of domestic violence from possessing a firearm.

**Response:**

  The United States admits the allegations of the 1st sentence.  With regard to the second sentence, the United States admits that the reference to § 922(g)(9) is a reference to 18 U.S.C. § 922(g)(9).

  **3.33** On November 7, 2012, after his conviction, Kelley returned to the Confinement Facility at Holloman.  Because his conviction changed his status from pretrial confinement detainee to post trial inmate, Air Force Corrections System policy required the confinement facility personnel to collect and submit Kelley's fingerprints during his in-processing into the confinement facility.  Air Force employees did not collect, maintain, or submit Kelley's fingerprints to the FBI.  Air Force agents or employees did not submit a final disposition report of Kelley's criminal history to the FBI.  Air Force policy requires agents to submit the final disposition report within fifteen days (15) of Kelley's sentencing.

**Response:**

  The United States admits the allegations contained in the 1st sentence.  The allegations of the 2nd sentence are conclusions of law that do not require a response.  To the extent that a response is required, the United States incorporates its responses to paragraph 2.16.  With regard

to the 3rd sentence, the United States denies that Kelley's fingerprints were never collected; the United States only admits that Kelley's fingerprints were not submitted to the FBI prior to the tragic events at issue in this litigation.  With regard to the 4th sentence, the United States only admits a final disposition report concerning Kelley was not submitted to the FBI in connection with Kelley's post-conviction detainment.  The allegations of the 5th sentence are conclusions of law that do not require a response.  To the extent that a response is required, the United States incorporates its response to paragraph 2.20.

**3.34**    On December 14, 2012, the Air Force Office of Special Investigations received a Report and Result of Trial of Devin Kelley.  Per policy, the Air Force should have reported the final disposition of Devin Kelley's convictions to the FBI.  But it did not.  Instead, the Air Force Special Agent in Charge certified that Kelley's fingerprints were submitted to the FBI.  This permitted the agent to close the investigation file when, in fact, the Air Force never collected, maintained, or submitted Devin Kelley's fingerprints or final disposition reports to the FBI.

**Response:**

With regard to the allegations in the 1st sentence, the United States only admits that the Air Force Office of Special Investigations received a Report and Result of Trial of Devin Kelley.  The allegations of the 2nd sentence are conclusions of law that do not require a response.  To the extent that a response is required, the United States incorporates its response to paragraph 2.20.  With regard to the 3rd sentence, the United States only admits that a final disposition report concerning Kelley was not submitted to the FBI prior to the tragic events at issue in this litigation.  The United States is without sufficient knowledge to admit or deny the allegations of the 4th sentence and, therefore, denies them.  With regard to the 5th sentence, the United States denies that Kelley's fingerprints were never collected and lacks information sufficient to admit

or deny whether the fingerprints or final disposition report were maintained in the investigation file; the United States only admits  that neither Kelley's fingerprints nor a final disposition report were submitted to the FBI prior to the tragic events at issue in this litigation.

**3.35**     On December 18, 2012, Kelley was transferred to and incarcerated at the Naval Consolidated Brig, Miramar, California, until his release on March 31, 2013.  During his intake evaluation, Naval Consolidated Brig personnel placed Kelley in separate sleeping quarters from the general population while conducting medical and psychological assessments of him. Because of the evaluation, Kelley was classified as a "suicide risk in gown" as well as an "Assault risk – escape risk."

**Response:**

The United States admits the allegations in the 1st sentence of paragraph 3.35.  With regard to the 2nd sentence, the United States only admits that Naval Consolidated Brig personnel placed Kelley in separate sleeping quarters from the general population.  With regard to the 3rd sentence, the United States only admits that "suicide risk in 'gown'" as well as an "Assault risk" and "escape risk" are listed on the segregation form as reasons for Kelley's segregation.

**3.36**     On March 31, 2013, Kelley was released from the Naval Consolidated Brig, upon completion of his sentence.  Between March 31, 2013, and April 2, 2013, Kelley completed Air Force out-processing paperwork and was ordered "not to enter or reenter or be found within the limits of the United States military installation of Holloman Air Force Base, New Mexico, for an indefinite period."

**Response:**

Admitted.

**3.37**     On December 3, 2013, the Air Force Court of Criminal Appeals affirmed the findings and sentencing in Kelley's court-martial.  On May 9, 2014, after the automatic appeals courts upheld Kelley's conviction and sentence, he was officially separated from the Air Force with a Bad Conduct Discharge.

**Response:**

        Admitted.

**3.38**     On September 30, 2016, Kelley's former 49th Logistics Readiness Squadron supervisor received a threatening message from Kelley on Facebook.  The message stated, "Hey you stupid b****.  You should have been put in the ground a long time ago.  Better hope I don't ever see you.  You can't face facts, you fat piece of s***."  Kelley's former supervisor said that she had not attempted to contact Kelley before receiving the message, and that it was unexpected.  She stated that she saved Kelley's Facebook message as a screenshot and forwarded it to her former Air Force supervisor.  Kelley's former supervisor also stated that she had considered reporting this incident to law enforcement and obtaining a restraining order against Kelley, but decided against it because she felt that he would find out where she lived.

**Response:**

        With regard to the allegations of the 1st sentence of paragraph 3.38, the United States admits that in an interview with an FBI agent, Kelley's former 49th Logistics Readiness Squadron supervisor stated that she had received a threatening message from Kelley on Facebook.  With regard to the 2nd sentence, the United States only admits on that Kelley's former 49th Logistics Readiness Squadron supervisor stated that the message stated "Hey you stupid b****. You should have been put in the ground a long time ago. Better hope I don't ever see you.  You can't face fat piece of s***."  The United States is without sufficient knowledge to

admit or deny the remaining allegations in the 3rd and 4th sentences, and therefore denies them. With regard to the 5th sentence, the United States only admits that Kelley's former supervisor stated to an FBI agent that she "did not pursue a restraining order against Kelley because she did not want him to become aware of her address."

> **D.   Kelley commits a mass shooting at the Sutherland Springs First Baptist Church on November 5, 2017.**

**3.39**     On December 22, 2014, Kelley purchased a Glock Model 19, a 9-millimeter, semi-automatic handgun, from Specialty Sports and Supply, in Colorado Springs, Colorado.  He completed the ATF Forms 4473 and the store completed the required NICS check on the same day.  The response provided was that the sale could proceed.

**Response:**

> Admitted.

**3.40**     On June 26, 2015, Kelley purchased a Ruger GP100, a .357 Magnum, revolver handgun, again from Specialty Sports and Supply in Colorado Springs.  He completed the ATF Form 4473 and the store completed the required NICS check on the same day.  The response provided was that the sale could proceed.

**Response:**

> Admitted.

**3.41**     On April 7, 2016, Kelley purchased a Ruger AR-556, a 5.56-millimeter, semi-automatic rifle, from Academy Sports and Outdoors (Store No. 41), in San Antonio, Texas.  He completed the ATF Form 4473, and the store completed the required NICS check on the same day.  The response provided was that Academy could proceed with the sale.

**Response:**

> Admitted.

**3.42**     On October 18, 2017, Kelley purchased a Ruger SR22, a .22 caliber, semiautomatic handgun, from Academy Sports and Outdoors (Store No. 46), in Selma, Texas. He completed the ATF Form 4473 and the store completed the required NICS check on the same day.  The response provided was that Academy could proceed with the sale.

**Response:**

     Admitted.

**3.43**     On four ATF Forms 4473 that Kelley filled out to purchase the firearms after his conviction, he certified that he had never been convicted of any crime for which the judge could sentence him for more than 1 year in confinement.  One of the questions on ATF Form 4473 asks, "Have you ever been convicted in any court of a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation."  Kelley should have answered "yes" to this question.

**Response:**

     Admitted.

**3.44**     On November 5, 2017, Kelley entered the First Baptist Church of Sutherland Springs, Sutherland Springs, Texas, and opened fire with three of the four firearms he had purchased.  He killed 26 people and wounded 22 others.  After being shot by armed citizens who responded to the shooting, Kelley fled from the church in his automobile.  Kelley later died from a self-inflicted gunshot wound.

**Response:**

     The United States admits the allegations contained in the 1st sentence of paragraph 3.44. With regard to the 2nd sentence, the United States admits that Kelley killed 26 people and wounded at least 20 others.  With regard to the 3rd sentence, the United States admits only that

Kelley was shot by an armed citizen and that Kelley fled from the church in his automobile. With regard to the 4th sentence, the United States admits that Kelley sustained a self-inflicted gunshot wound, but lacks information sufficient to admit or deny whether it was the cause of his death.

## IV.   AIR FORCE'S COMISSIONS & OMISSIONS

### A.   The Department of Air Force missed multiple opportunities to provide Devin Kelley's fingerprint cards and final disposition reports to the FBI

**4.1**      On June 9, 2011, the Air Force first missed its opportunity to submit Kelley's fingerprint cards to the FBI, when the Office of Special Investigations opened an investigation into the assault of Kelley's stepson.

**Response:**

The United States only admits that in Report No. DODIG-2019-030, the DoD OIG stated that "The first missed opportunity for the USAF to submit Kelley's fingerprints to FBI occurred on June 9, 2011[]" when "AFOSI Detachment 225 opened an investigation for assault on a child, listing Kelley as a subject . . . ."

**4.2**      Also on June 9, 2011, an Air Force Special Agent wrote an affidavit to the military magistrate to obtain authority to search Kelley's on-base residence for evidence related to Kelley's alleged assault of his stepson.  In the affidavit, the Special Agent wrote that he believed probable cause existed to search for evidence of child abuse.  On June 17, 2011, a second Special Agent wrote a separate affidavit to a military magistrate requesting authority to seize certain property from Kelley.  In that affidavit, the agent represented that he or she believed that probable cause existed to seize the property to determine the source of the victim's injuries. Even though Air Force agents believed that probable cause existed, they never submitted to the FBI the fingerprint cards collected on the June 9th interview.  Additionally, their supervisors did

not create a note in the investigative case file stating that the fingerprint card had been reviewed, as required by Air Force Office of Special Investigation Handbook 71-105.  Almost certainly, the supervisors failed to certify the review of the cards because they did not review them.

**Response:**

The United States admits the allegations contained in the 1st through 4th sentences of paragraph 4.2.  With regard to the 5th sentence, the United States only admits that it is not aware of any evidence that Kelley's fingerprints were sent to the FBI prior to the tragic events at issue in this litigation, and is without sufficient knowledge to admit or deny the remaining allegations and, therefore, denies them.  The allegations of the 6th sentence are conclusions of law that do not require a response.  To the extent that a response is required, the United States incorporates its responses to paragraph 2.18.  The United States lacks information sufficient to admit or deny the allegations of the 7th sentence, and therefore denies them.

**4.3**    The Air Force Special agents who interviewed Kelley on June 9, 2011 knew of the Air Force policy requirements to collect and submit fingerprints to the FBI.  The agents were unable to provide any reason why the Air Force failed to submit Kelley's fingerprints to the FBI.  The Department of Defense Inspector General concluded that the Special Agents did not follow Department of Defense and Air Force policies regarding the submission of fingerprints, and that some agents did not understand the policies.  The Inspector General also found confusion among the Special Agents as to when fingerprints should be submitted to the FBI.  The former Special Agent-in-Charge and Superintendent believed that fingerprints were normally submitted within 2 days of the subject interview.  The case agent stated that at the time of the Kelley assault investigation, he was not aware that of the requirement for submission of the fingerprints to the FBI upon a probable cause determination.

**Response:**

The United States lacks information sufficient to admit or deny the allegations of the 1st and 2nd sentences and, therefore, denies them.  The characterizations of the findings in the Inspector General report are taken out of context, and no response is required.  To the extent a response is required, the United States only admits that in Report DODIG-2019-030, the OIG stated that "Special Agents did not follow DoD and AFOSI policies regarding the submission of fingerprints, and some did not understand the policies."  With regard to the allegations of the 4th sentence, the United States only admits that in that Report, the OIG stated that it "found confusion among the AFOSI Special Agents as to when fingerprints should be submitted to the FBI CJIS Division[.]"  With regard to the allegations of the 5th sentence, the United States only admits that in that Report, the OIG stated that the "former SAIC and Superintendent believed that fingerprints were normally submitted within 2 days of the subject interviews[.]"  With regard to the 6th sentence, the United States only admits that the agent told the Inspector General that "at the time of the Kelley assault investigation, he was not aware of the requirement for submission of the fingerprints to the FBI CJIS Division upon a probable cause determination."

**4.4**     The second missed opportunity for the Air Force to submit Kelley's fingerprints to the FBI occurred on February 17, 2012.  The 49th Security Forces Squadron opened an investigation on Kelley for assaulting Tessa Kelley, after she told the 49th Security Forces Squadron investigators that Kelley had been physically abusing her since July 2011.  At that time, the investigators should have collected Kelley's fingerprints, in accordance with Department of Defense and Air Force policy.  At the time, the Air Force had probable cause to believe that Kelley committed assault.  The Inspector General concluded that Air Force

investigators did not have a clear understanding of, and did not follow, DoD and USAF policy regarding the collection and submission of fingerprints.

**Response:**

With regard to the allegations of the 1st sentence of paragraph 4.4, the United States only admits that in Report No. DODIG-2019-030, the DoD OIG stated that "The second missed opportunity for the USAF to submit Kelley's fingerprints to the FBI occurred on February 17, 2012." The United States admits the allegations contained in the 2nd sentence. The allegations of the 3rd sentence are conclusions of law that do not require a response. To the extent that a response is required, the United States only incorporates its responses to paragraphs 2.14 and 2.16. The United States lacks information sufficient to admit or deny the allegations of the 4th sentence and, therefore, denies them. The characterizations of the findings in the Inspector General report of the 5th sentence are misleading and taken out of context, and no response is required. To the extent that a response is required, the United States only admits that in Report DODIG-2019-030, the OIG states "investigators did not have a clear understanding of, and did not follow, DoD and USAF policies regarding the collection and submission of fingerprints when they investigated the domestic violence complaint made by Tessa Kelley against Kelley."

**4.5** The third missed opportunity for the Air Force to collect and submit Kelley's fingerprints to FBI occurred on June 8, 2012, when Air Force Office of Special Investigations interviewed Kelley immediately after he was placed in pretrial confinement. Air Force investigators believed that probable cause existed that Kelley assaulted his stepson based on the evidence collected, including Kelley's confession on video. According to records of the interview with Kelley, investigators collected Kelley's fingerprints at the end of the subject interview. The Air Force negligently maintained Devin Kelley's fingerprints because a review

of the case file found no fingerprint cards within it.  Regardless, Air Force agents or employees did not submit the fingerprint cards to the FBI.  So, while Special Agents initialed the block signifying that they collected Kelley's fingerprints, there is no evidence that they were collected and submitted to the FBI.

**Response:**

With regard to the allegations of the 1st sentence of paragraph 4.5, the United States only admits that Air Force Office of Special Investigations interviewed Kelley after he was placed in pretrial confinement and that in Report No. DODIG-2019-030, the OIG states the "third missed opportunity for the USAF to collect and submit Kelley's fingerprints to FBI occurred on June 8, 2012."  With regard to the 2nd sentence, the United States only admits that Air Force investigators told DoD OIG investigators that they believed that probable cause existed that Kelley assaulted his stepson, based on Kelley's admission in the video.  The United admits the allegations in the 3rd sentence.  The allegations of the 4th sentence are conclusions of law that do not require a response.  To the extent that a response is required, the United States denies the allegations.  With regard to the 5th sentence, the United States only admits that Kelley's fingerprints were not sent to the FBI prior to the tragic events at issue in this litigation.  With regards to the 6th sentence, the United States only admits that the block signifying the Kelley's fingerprints were collected was marked and that Kelley's fingerprints were not sent to the FBI prior to the tragic events at issue in this litigation.

4.6     The Inspector General concluded Special Agents did not know or follow Department of Defense and Air Force policy, and they did not collect and submit Kelley's fingerprints to the FBI following his second subject interview on June 8, 2012.  The failure to collect or submit the fingerprints occurred, in part, because of the Special Agent-in-Charge's

practice not submit the fingerprints to the FBI until after the Detachment received the Report of Result of Trial from the Staff Judge Advocate or the Commander's record of discipline. However, none of the Special Agents could provide a sufficient or supportable reason why Kelley's fingerprints were not collected or submitted following his subject interview.

**Response:**

The characterizations of the findings in the Inspector General report included in the 1st sentence of paragraph 4.6 are misleading and taken out of context, and no response is required. To the extent that a response is required, he United States only admits that in Report No. DODIG-2019-030, the OIG states that it "concluded that the AFOSI Special Agents did not know or follow DoD and AFOSI policy, and they did not collect and submit Kelley's fingerprints to the FBI CJIS Division following his second subject interview on June 8, 2012." With regard to the 2nd sentence, the United States only admits that that in Report No. DODIG-2019-030, the OIG stated that "[t]he failure to collect or submit the fingerprints occurred, in part, because of the SAIC's practice not [*sic*] submit the fingerprints to the FBI CJIS Division until after the Detachment received the Report of Result of Trial from the Staff Judge Advocate or the Commander's record of discipline". With regard to the 3rd sentence, the United States only admits that in Report No. DODIG-2019-030, the OIG stated that "none of the Special Agents could provide a sufficient or supportable reason why Kelley's fingerprints were not collected or submitted following his subject interview."

4.7     The fourth missed opportunity for the Air Force to submit Kelley's fingerprints and the first missed opportunity to submit Kelley's final disposition report to the FBI occurred on November 7, 2012, when the Air Force convicted Kelley by General Court-Martial for assault on Tessa Kelley and his stepson. As noted above, Air Force Corrections System policy required

the confinement facility personnel to collect an inmate's fingerprints and submit the fingerprints with final disposition during in-processing into the confinement facility.  As required by Air Force Instruction 31-205, the 49th Security Forces Squadron Confinement Facility staff should have included the final disposition on the fingerprint card they collected when they in-processed Kelley into the confinement facility after his court-martial.  That fingerprint card should have been sent to the FBI with the final disposition report.

**Response:**

With regard to the 1st sentence, the United States only admits that in Report No. DODIG-2019-030, the OIG stated that "[t]he fourth missed opportunity for the USAF to submit Kelley's fingerprints and the first missed opportunity to submit Kelley's final disposition report to the FBI occurred on November 7, 2012, when the Air Force convicted Kelley by General Court-Martial for assault on Tessa Kelley and his stepson."  The allegations of the 2nd through 4th sentences are conclusions of law that do not require a response.  To the extent that a response is required, the United States incorporates its response to paragraph 2.16.

**4.8**     When the Air Force processed Kelley for post-trial confinement, the Air Force confinement staff failed to collect Kelley's fingerprints.  The Confinement Facility personnel did not follow Department of Defense and Air Force policy for collecting and submitting fingerprints and final disposition reports to the FBI.  Personnel also did not know and were not trained that once fingerprints were collected, they should be submitted to the FBI.  So, even if they had collected Devin Kelley's fingerprints and final disposition data, more likely than not, the personnel would not have submitted them to the FBI as a proximate result of the lack of training and supervision.

**Response:**

The United States is without sufficient knowledge to admit or deny the allegations of the 1st, 3rd and 4th sentences and, therefore, denies them.  The allegations of the 2nd sentence are conclusions of law that does not require a response.  To the extent that a response is required, the United States incorporates its response to paragraph 2.16.

**4.9**     The second missed opportunity for the Air Force to submit Kelley's final disposition report to the FBI occurred on December 14, 2012, when the Office of Special Investigations Detachment 225 Special Agent-in-Charge received the results of Kelley's trial and closed the Kelley investigation.  The Agent falsely certified in the Air Force's database system that the Air Force submitted to the FBI Kelley's fingerprints and final disposition reports.  Moreover, the investigative case file cover sheet did not contain a supervisor's signature or a date to signify that the file was reviewed for closure, as required by Air Force Office of Special Investigations Manual 71-121.

**Response:**

With regard to the allegations of the 1st sentence of paragraph 4.9, the United States only admits that in Report No. DODIG-2019-030, the OIG stated that the "second missed opportunity for the USAF to submit Kelley's final disposition report to the FBI occurred on December 14, 2012, when the AFOSI Detachment 225 SAIC received the results of Kelley's trial and closed the Kelley investigation[,]"and admits that the Special Agent-in-Charge was on the distribution list for report detailing the results of Kelley's trial.  The United States is without sufficient knowledge to admit or deny the allegations of the 2nd sentence and, therefore, denies them.  The allegations of the 3rd sentence are conclusions of law that require no response.  To the extent that a response is required, the United States only admits that paragraph 9.1 of AFOSI 71-121 states that "Unit leadership authenticates the supervision and quality control over the screening process

by signing and dating the AFOSI Form 2, when prepared, or reviewing the electronic file to be

Closed."

**B.    Systematic failures in operations, organization, hiring, training, and supervision caused the Air Force's failure to collect, maintain, and submit Devin Kelley's fingerprint cards and final disposition reports to the FBI.**

    4.10    The Air Force's failure to collect, maintain, and submit fingerprint cards and final

disposition reports to the FBI was not an isolated error.  Instead, this failure was caused by

failures in operations, organization, training, and supervision.

**Response:**

    With regard to the 1st sentence of paragraph 4.10, the allegations are irrelevant and

immaterial to this complaint and therefore no response is required.  The rest of the paragraph is

denied.

    4.11    For example, the Detachment leadership did not review the file or complete the

Closed Investigative File checklist and the Investigative Information Management System

checklist properly.  Instead, the Special Agent-in-Charge assumed that the case agent had

completed the actions necessary and submitted Kelley's fingerprints and final disposition to the

FBI.  He therefore completed the two checklists without verifying that the fingerprints and final

disposition report had been submitted to the FBI.  If the Agent-in-Charge and Superintendent had

included a review of Kelley's fingerprints in the leadership review, the fact that the fingerprints

had not been submitted would have been identified.

**Response:**

    The United States is without sufficient knowledge to admit or deny the allegations of

paragraph 4.11 and, therefore, denies them.

4.12     Next, according to Air Force Office of Special Investigations Manual 71-121, all criminal investigations require monthly supervisory reviews to ensure that investigators follow policy and that investigations are sufficient and timely.  Air Force leadership conducted 15 supervisory reviews of the Kelley investigation from June 29, 2011, through October 5, 2012. However, none of the supervisory reviews that were documented discussed fingerprint card collection or submission.  Although Air Force policy required supervisory reviews to include the investigatory case file, no such reviews of the case file occurred.  Kelley's fingerprint cards were retained in the investigative case file.  Had they reviewed the case file, more likely than not, they would have identified that the Air Force had not submitted Kelley's fingerprints to the FBI.  The monthly supervisory reviews of Kelley's investigative case file were incomplete and ineffective in identifying that Kelley's fingerprint cards remained in the investigative case file and had not been submitted to the FBI.

**Response:**

The allegations of the 1st and 4th sentences of paragraph 4.12 are conclusions of law that require no response.  To the extent that a response is required, the United States incorporates its response to paragraph 2.20.  With respect to the 2nd sentence, the United States only admits that there were at least 15 documented reviews of the Kelley investigation from June 29, 2011, through October 5, 2012.  The United States admits the allegations of the 3rd sentence.  The United States is without sufficient knowledge to admit or deny the allegations of the 5th and 6th sentences and, therefore, denies them.

4.13     The high turnover and disorganization in the Office of Special Investigations contributed to the Air Force's failure to collect, maintain, and submit Kelley's fingerprint cards and final disposition reports to the FBI.  Between June 2011 and March 31, 2013, Air Force

Office of Special Investigations Detachment 225 had two Special Agents-in-Charge and three interim Special Agents-in-Charge. The second interim Agent-in-Charge described the administrative process for closing cases was a "disaster" as a result of the large backlog of investigative case files stacked throughout the office. The third interim agent observed approximately 30 cases spread throughout the Detachment office area in various stages of closure, in terrible condition, with many of the cases missing investigative documentation and corresponding activities with the agent notes. Air Force assigned a permanent Agent-in-Charge in December 2011. This agent noticed that staffing challenges and operations tempo caused the office to be "hell." The office was severely behind in closing out old cases and described the unit as a "bottomless pit" that was impossible to dig out from.

**Response:**

The United States is without sufficient knowledge to admit or deny the allegations of the 1st sentence of paragraph 4.13 and, therefore, denies them. The United States admits the allegations of the 2nd sentence. The United States is without sufficient knowledge to admit or deny the allegations of the 3rd through 7th sentences, and, therefore, denies them.

**4.14**    The Inspector General determined that the Air Force's failure to submit Kelley's fingerprints was part of a systemic problem with the Office of Special Investigations Detachment 225. After reviewing 70 closed investigations for fingerprint card and final disposition report submission to the FBI, the Inspector General found 8% of cases where investigators did not collect fingerprints; 20% of cases where investigators collected, but did not submit to the FBI, fingerprint cards; and 31% of cases where investigators failed to submit to the FBI final disposition reports.

**Response:**

With regard to the allegations of the 1st sentence of paragraph 4.14, the United States only admits that in Report No. DODIG-2019-030, the OIG stated that the "failure to submit Kelley's fingerprints was part of a systemic problem in AFOSI Detachment 225." With regard to the allegations of the 2nd sentence, the United States admits that in Report No. DODIG-2019-030, the OIG stated that "[i]n the 70 investigations, there were 49 subjects whose fingerprints and final disposition reports should have been submitted to the FBI CJIS Division in accordance with DoD and AFOSI policy. The AFOIS Detachment 225 collected 45 of required 49 (92 percent) subject's fingerprints. However, the AFOSI Detachment 225 did not submit 10 of the required 49 (20 percent) subject fingerprint cards to the FBI CJIS Division. In addition, the AFOSI Detachment 225 did not submit 15 of the required 49 (31 percent) final disposition reports to the FBI CJIS Division."

**4.15**   In 2014, the Inspector General of the Department of Defense evaluated the reporting system's compliance with its own mandatory procedures and policies. The principal finding of this investigation condemned the performance of the Department of Defense. Specifically, it found that the military was:

> not reporting criminal incident data to the Federal Bureau of Investigation (FBI) for inclusion in the annual Uniform Crime Reports to the President, the Congress,
> State governments, and officials of localities and institutions participating in the Uniform Crime Report Program, as required by Federal law.

As a result of this failure:

> 10 years of DoD criminal incident data have not been provided to the FBI for inclusion in the annual uniform crime reports to the President, the Congress, State governments, and officials of localities and institutions participating in the UCR Program, as

implemented in DoD Directive 7730.47 and DoD Manual
7730.47-M, Volume 1.

**Response:**

With regard to the allegations of the 1st sentence of paragraph 4.15, the United States

only admits that in Report No. DODIG-2015-011, the OIG stated that it "evaluated the Defense

Criminal Investigative Organizations' (DCIOs) process for reporting accurate criminal incident

data to Defense Incident-Based Reporting System (DIBRS) in accordance with DoD Manual

(DoDM) 7730.47-M, Volume 1, 'Defense Incident-Based Reporting System (DIBRS): Data

Segments and Elements,' December 7, 2010." The characterizations of the findings in the

Inspector General report stated in the 2nd sentence are misleading and taken out of context, and

are irrelevant and immaterial, and no response is required. With regard to the 3rd and 4th

sentences, the quotations are taken out of context and the United States only admits that the

quotes from Report No. DODIG-2015-011 are accurate and incorporates its response to

paragraph 2.15.

4.16    At the time of the Kelley investigation, the Air Force Security Forces Center was

responsible for training, equipping, and organizing all Security Forces for the Air Force. At the

time of the Kelley assault investigation, the Air Force Security Forces Academy did not train

students on fingerprint card collection and submission or on final disposition report submission

procedures. In 2015, the Air Force Security Forces created fingerprint training as part of the

"Annual Home Station Training" requirements. The 1-hour long lesson plan was designed to be

used by individual Security Forces Squadrons to train personnel on the physical collection of

fingerprints and completion of the fingerprint card. However, the lesson plan does not contain

any information relating to the submission of fingerprints. Additionally, the lesson plan did not

reference Department of Defense or Air Force policy requirement and did not specify the

conditions under which the fingerprint cards should be submitted nor did the lesson plan discuss the submission of the final disposition report.

**Response:**

The United States is without sufficient knowledge to admit or deny the allegations of paragraph 4.16 and, therefore, denies them.

**4.17** The agents working on the Kelley investigation acknowledge the lack of training. One investigator explained that the only fingerprint training he received was "on-the-job" and that it related to the collection of fingerprints. Other investigators could not recall any training on fingerprinting subjects of investigation and under what circumstances. Neither did the Air Force provide training on an annual or reoccurring basis. The Inspector General interviewed one officer who explained that the majority of 49th Security Forces personnel were not familiar with collecting fingerprints at the time of the Kelley assault investigation.

**Response:**

The United States is without sufficient knowledge to admit or deny the allegations of the 1st and 4th sentences of paragraph 4.17 and, therefore, denies them. With regard to the 2nd sentence, the United States only admits that in Report No. DODIG-2019-030, the OIG stated that one investigator "stated he did not recall receiving any training on fingerprint collection and submission . . . and said that the only training he remembered was some on-the-job training . . . ." With regard to the 3rd sentence, the United States only admits that certain investigators stated that they could not specifically recall training on fingerprinting subjects of investigation when asked by DoD OIG agents. With regard to the allegations of the 5th sentence, the United States only admits that in Report No. DODIG-2019-030, the OIG stated that "[t]he investigator told us that

the majority of 49th Security Forces personnel were not familiar with collecting fingerprints at the time of the Kelley assault investigation."

## V. CAUSES OF ACTION

### A.   Negligence[9]

**5.1**     The Department of Air Force failed to use ordinary care and failed to do that which a person of ordinary prudence would have done under same or similar circumstances by failing to collect, maintain, and transmit Devin Kelley's fingerprint's to the FBI, as described in this Complaint.

**Response:**

The allegations of paragraph 5.1 are conclusions of law that require no response.  To the extent that a response is required, they are denied.

**5.2**     The Department of Air Force failed to use ordinary care and failed to do that which a person of ordinary prudence would have done under same or similar circumstances by failing to submit Devin Kelley's final disposition information to the FBI, as described in this Complaint.

**Response:**

The allegations of paragraph 5.2 are conclusions of law that require no response.  To the extent that a response is required, they are denied.

**5.3**     The Department of the Air Force negligently failed to report criminal incident data to the Defense Incident-Based Reporting System of Devin Kelley's criminal conviction of a

---

[9] Per the District Court's order in the related proceeding.  Plaintiff has not included a cause of action sounding in negligence *per se*. ECF Doc. #59 (May 23, 2019).  Plaintiff reserves the right to appeal this decision and would have included the cause of action, but for the Court's order.

crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, and commitment to the mental institution.

**Response:**

The allegations of paragraph 5.3 are conclusions of law that require no response. To the extent that a response is required, they are denied.

5.4     The Department of the Air Force failed to submit criminal-history data to the FBI when probable cause existed in the Air Force Office of Special Investigations and Air Force Security Forces investigations on Kelley, after Kelley's court-martial conviction, and also upon his post-trial confinement at Holloman Air Force Base.

**Response:**

The allegations of paragraph 5.4 are conclusions of law that require no response. To the extent that a response is required, the United States only admits that information pertaining to Kelley's conviction was not submitted to the databases available to the NICS, i.e., the FBI's III, NCIC, or NICS Indices, but is without sufficient knowledge to admit or deny the allegations concerning whether probable cause existed in the Air Force Office of Special Investigations and Air Force Security Forces investigations on Kelley and, therefore, denies them.

5.5     The United States, through Secretary of the Air Force Heather Wilson, admitted the allegations found in Paragraph 5.4 in response to a question by Senator Mazie K. Hirono in a submission dated December 13, 2017.

**Response:**

The United States admits that in a submission dated December 13, 2017, in response to a question by Senator Mazie K. Hirono, Secretary of the Air Force Heather Wilson stated that "We failed to submit criminal history data to the FBI when probable cause existed in the Air Force

Office of Special Investigations and Air Force Security Forces investigations on Kelley, after Kelley's court-martial conviction, and also upon his post-trial confinement at Holloman AFB."

**5.6** Alternatively, the Department of the Air Force negligently submitted inaccurate or incomplete criminal incident data to the Defense Incident-Based Reporting System of Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, or commitment to the mental institution.

**Response:**

The allegations of paragraph 5.6 are conclusions of law, and are irrelevant and immaterial, and therefore do not require a response.  To the extent a response is required, the United States denies that DoDI 7730.47 reflects the reporting standards for criminal incident data directly to the FBI by DoD components with assigned law enforcement agencies or activities.

**5.7** The Department of the Air Force negligently failed to correct incomplete or incorrectly submitted criminal-incident data to the Defense Incident-based Reporting System of Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, or commitment to the mental institution.

**Response:**

The allegations of paragraph 5.7 are conclusions of law, and are irrelevant and immaterial, an therefore do not require a response.  To the extent a response is required, the United States denies that DoDI 7730.47 reflects the reporting standards for criminal incident data directly to the FBI by DoD components with assigned law enforcement agencies or activities.

**5.8** The Department of the Air Force negligently failed to submit fingerprint cards and final disposition reports for Devin Kelley's criminal convictions, or alternatively submitted incomplete or incorrect data to the FBI as required by federal law.  As a result, the FBI's Next

Generation Identification database lacked critical information about Devin Kelley's history and failed to prevent the sale of firearms to Devin Kelley.

**Response:**

The allegations of the 1st sentence of paragraph 5.8 are conclusions of law that do not require a response.  To the extent a response is required, the United States incorporates its response to paragraph 2.16 and 2.20.  With regard to the 2nd sentence, the United States only admits that information pertaining to Kelley's conviction was not submitted to the databases available to the NICS, i.e., the FBI's III, NCIC, or NICS Indices.

**5.9**      Findings by the Inspector General confirmed the Air Force Office of Special Investigations and Security Forces personnel then assigned at Holloman Air Force Base, New Mexico, did not report required information to civilian law enforcement in the Kelley case.  The review also found the error in the Kelley case was not an isolated incident and similar reporting lapses occurred at other locations.

**Response:**

The characterizations of the findings in the Inspector General report stated in paragraph 5.9 are vague, misleading and taken out of context, and no response is required.  To the extent that a response is required to the 1st sentence, the United States only admits that a Department of the Air Force press release published on November 28, 2017, states that "Preliminary findings by the Air Force Inspector General confirmed the Air Force Office of Special Investigations and Security Forces personnel then assigned at Holloman Air Force Base, New Mexico, did not report required information to civilian law enforcement in the Kelley case."  With regard to the 2nd sentence, to the extent that a response is required, the United States only admits that the

same press release states that "The review also found the error in the Kelley case was not an isolated incident and similar reporting lapses occurred at other locations."

**5.10**    In fact, the problem was widespread across both the Office of Special Investigations and the Air Force Security Forces.  A 2015 Defense Department audit revealed that the Air Force was not in compliance with a mandatory statutory requirement to report all offender criminal history data and, despite the discovery of non-compliance, the Air Force made no retroactive corrections.

**Response:**

The allegations of the paragraph 5.10 are vague, misleading and taken out of context, and no response is required.  To the extent that a response is required, with regard to the 1st sentence, the United States only admits that, in a hearing before the United States Senate Judiciary Committee on December 6, 2017, Secretary Wilson stated that "Our inquiry indicates the breakdown in submitting offender criminal history data was not limited to this case, or to Holloman Air Force Base.  The problem was widespread across both the Office of Special Investigations and the Air Force Security Forces."  With regard to the 2nd sentence, to the extent that a response is required, the United States only admits that Secretary Wilson stated at that same hearing that "Although some corrective measures were implemented after the 2015 Defense Department audit, particularly by Air Force OSI, the corrections made were not retroactive . . . ."

**5.11**    The Department of the Air Force admitted the allegations contained in Paragraph 5.9 in a press release published on November 28, 2017.  The Department of the Air Force, through the Secretary of the Air Force Heather Wilson, admitted the allegations contained in Paragraph 5.10 on December 6, 2017 before the United States Senate Judiciary Committee.

**Response:**

With regards to the 1st sentence in paragraph 5.11, the United States only admits that a Department of the Air Force press release published on November 28, 2017 stated that "Preliminary findings by the Air Force Inspector General confirmed the Air Force Office of Special Investigations and Security Forces personnel then assigned at Holloman Air Force Base, New Mexico, did not report required information to civilian law enforcement in the Kelley case. The review also found the error in the Kelley case was not an isolated incident and similar reporting lapses occurred at other locations."  With regards to the 2nd sentence in paragraph 5.11, the United States admits that in a hearing before the United States Senate Judiciary Committee on December 6, 2017, Secretary Wilson stated that "Our inquiry indicates the breakdown in submitting offender criminal history data was not limited to this case, or to Holloman Air Force Base.  The problem was widespread across both the Office of Special Investigations and the Air Force Security Forces.  Although some corrective measures were implemented after the 2015 Defense Department audit, particularly by Air Force OSI, the corrections made were not retroactive . . . ."  The United States denies that either the press release or the statements of the Secretary were judicial admissions that bind the United States in this litigation.

**5.12**    The Department of Defense negligently failed to ensure that the Department of the Air Force submitted the required criminal incident, fingerprint cards, and final disposition data.

**Response:**

The allegations of paragraph 5.12 are conclusions of law that do not require a response. To the extent a response is required, the United States denies them.

**5.13**    The Department of Defense negligently failed to ensure that identified criminal incident data errors are tracked to correction.

**Response:**

The allegations of paragraph 5.13 are conclusions of law that do not require a response. To the extent a response is required, the United States denies them.

**5.14**    The Department of Defense negligently failed to populate data about Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, and commitment to the mental institution from the Defense Incident-Based Reporting System into the FBI's National Incident-Based System.

**Response:**

The allegations of paragraph 5.14 are conclusions of law that do not require a response. To the extent a response is required, the United States denies that the Defense Incident-Based Reporting System reflects the reporting standards for criminal incident data directly to the FBI by DoD components with assigned law enforcement agencies or activities.

**B.    Negligent Failure to Train & Supervise**

**5.15**    The United States and its agencies has an obligation to adequately train and supervise employees.  The Air Force's failure to collect, maintain, and submit fingerprint cards and final disposition reports to the FBI was not an isolated error.  Instead, this failure was caused by failures in operations, organization, training, and supervision, as described in this Complaint.

**Response:**

The allegations of paragraph 5.15 are conclusions of law to which no response is required.

5.16     The United States, through its agencies, failed to adequate [sic] supervise the individuals who were tasked with the collection, maintenance, and submission of Devin Kelley's fingerprints and final disposition reports to the FBI or the DOD's DIBRS database.  Had they adequately supervised the collection of fingerprints, they would have noticed that in some instances, their employees did not collect fingerprints.  They would have noticed in other instances, their employees did not maintain fingerprint cards in the case file.  And they would have noticed that at no point, did their employees submit Devin Kelley's fingerprint cards or final disposition reports to the FBI for inclusion in the National Instant Criminal Background Check System.

**Response:**

Denied.

5.17     The United States Air Force at no point between 2009 and 2013 trained its employees to collect, maintain, and submit fingerprint cards and final disposition reports to the FBI for inclusion in the National Instant Criminal Background Check System.  Nor did the Air Force put in place a system that verified if the required reporting had occurred, which it had not.

**Response:**

Denied.

5.18     These failures by the Air Force and Department of Department of Defense to train and supervise its reporting personnel led to its employees failing to submit reports and data to both the DIBRS and FBI about Devin Kelley.  Thus, the United States is liable for negligent training and negligent supervision.

**Response:**

Denied.

C.    **Negligent Undertaking**

**5.19**    The United States Congress voluntarily undertook the creation of a national instant background check system upon passage of the Brady Bill. To implement this system, the Department of Justice created the National Instant Criminal Background Check System.  The Department of Defense and Department of Air Force implemented policies, procedures, manuals, and instructions—and acted under the color of these regulations—regarding the reporting of individuals who received convictions for domestic violence, incarceration for a crime punishable by more than one year, and mental institution commitment.  These policies and procedures included the collection, maintenance, and reporting of fingerprint cards of those disqualified individuals.

**Response:**

The allegations of paragraph 5.19 are legal conclusions that do not require a response. To the extent a response is required, the United States only admits that Congress passed the Brady Act, which required a national instant background check system; that such a system was implemented by the Department of Justice via NICS; and admits that the allegations of the 3rd and 4th statements are accurate as a general matter.

**5.20**    The United States, through its agencies, voluntarily undertook the training and supervision of its employees responsible for the collection, maintenance, and submission of fingerprint cards and final disposition reports to the FBI.

**Response:**

The allegations of paragraph 5.20 are legal conclusions that do not require a response. To the extent a response is required, the United States only admits that federal agencies train and

supervise employees who are responsible for the collection, maintenance, and submission of fingerprint cards and final disposition reports to the FBI.

**5.21**    The United States, through its agencies, voluntarily undertook the correction of inaccurate or incomplete submissions to FBI's National Instant Criminal Background Check System.  On multiple occasions, the Department of Defense's Inspector General alerted the United States and its agencies to its negligent failure to collect, maintain, and submit fingerprint cards and final disposition data to the FBI.  The Air Force agreed with the Inspector General's recommendations and agreed to take corrective action.

**Response:**

The allegations of the 1st sentence of paragraph 5.21 are legal conclusions that do not require a response.  To the extent a response is required, the United States admits the Department of Defense has established policies for complying with its reporting obligation to the National Instant Criminal Background Check System, which was created pursuant to the Brady Act.  The allegations of the 2nd sentence are legal conclusions that do not require a response.  To the extent a response is required, the United States denies the allegations.  The allegations of the 3rd sentence of are too vague and general to permit the United States to intelligently respond.

**5.22**    The United States, through Congress and its agencies, rendered these services because Congress and the agencies recognized that they were necessary for the protection of individuals like the Plaintiff.  To limit this violence, Congress disqualifies certain people from buying, owning, or possessing guns and established a national background check system to prevent these people from obtaining guns.  In fact, when asked the question, "[W]ho do you believe is the beneficiary of the Brady Act?  Who do you think Congress was trying to protect?" Thomas Ward, Deputy Assistant Attorney General for the United States responded, "All of us.

Three hundred and sixty-five million Americans."[10]  Mr. Ward told the truth when he stated the Brady Act was intended to protect all Americans.

**Response:**

The allegations of the 1st and 2nd sentences of paragraph 5.22 are conclusions of law that require no response.  To the extent that a response is required, the United States admits that Congress passed legislation that disqualifies certain people from buying, owning, or possessing guns and established a national background check system to further that end.  The allegations of the 3rd, 4th, and 5th sentences are irrelevant and immaterial, and the United States therefore denies them.  To the extent a response is required, the United States admits that Thomas Ward is quoted accurately.

**5.23**   The failure to use reasonable care increases the risk that individuals like Devin Kelley obtain firearms when they are prohibited by law from obtaining such firearms.  In fact, the foreseeable and proximate result of the failure to use reasonable care is that individuals like Devin Kelley will pass the background check when obtaining firearms for the use of mass murders, like the one he committed in Sutherland Springs.  What's more, the United States, through its agencies, knew of the specific increase of risk posed by Devin Kelley if the United States failed to exercise reasonable care in its undertaking because the United States knew of Devin Kelley's conduct between 2009 and 2013, as detailed in this Complaint and in the Department of Defense Inspector General's investigation of the matter.

---

[10] *Sanders v. United States*, No. 18-1931 (4th Cir. May 7, 2019) (Oral Argument).

**Response:**

The allegations of the 1ˢᵗ and 2ⁿᵈ sentences of paragraph 5.23 are conclusions of law that do not require a response.  To the extent that a response is required, the United States denies the allegations.  The United States denies the allegations of the 3ʳᵈ sentence.

5.24    The United States, through its agencies, negligently failed to: (a) collect, maintain, and transmit Devin Kelley's fingerprint cards to the FBI and DOD DIBRS; (b) submit Devin Kelley's final disposition report to the FBI and DOD DIBRS; (c) train and supervise its employees and agents with regard to the collection, maintenance, and transmission of fingerprint cards to the FBI and DOD DIBRS; (d) train and supervise its employees and agents with regard to the  submission of final disposition reports to the FBI and DOD DIBRS; and (c) [*sic*] take corrective action multiple times when alerted to this negligence.

**Response:**

The allegations of paragraph 5.24 are conclusions of law that do not require a response. To the extent that a response is required, the United States denies the allegations.

## VI. CAUSATION

### A.    Department of Defense and Department of the Air Force's negligence caused injuries to the Plaintiff.

6.1    One or more of the above negligent acts of the Department of the Air Force and the Department of the Defense directly and proximately caused injury to the Plaintiff.

**Response:**

Denied.

6.2    When Devin Kelley attempted to purchase firearms to use in the Sutherland Springs shooting, the FBI Incident-Based Reporting System should have included Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one

year, convictions of domestic violence, and commitment to the mental institution.  The FBI's database did not contain any of this required information, or alternatively, contained incorrect or incomplete information, as a direct and proximate result of one or more of negligent acts of the Department of Defense and Department of the Air Force.

**Response:**

The allegations of paragraph 6.2 are irrelevant and immaterial, and no response is required.  To the extent a response is required, the allegations are denied.  The United States denies that it owed a duty to the Plaintiffs that is actionable under Texas law with regard to the FBI Incident-Based Reporting System.

**6.3**     When Devin Kelley attempted to purchase firearms to use in the Sutherland Springs shooting, the FBI's National Instant Criminal Background Search System should have contained Devin Kelley's criminal history, populated from the FBI's Next Generation Identification (or the Interstate Identification Index) system.  The FBI's National Instant Criminal Background Search System should have contained Devin Kelley's criminal history populated by submission of his final disposition report from the Air Force.  However, because of the Government's negligence, Kelley's fingerprint identification and criminal disposition reports were not submitted to the FBI and the FBI's Background Check System did not disqualifying information on Devin Kelley.

**Response:**

With regard to the allegations of the 1st and 2nd sentences of paragraph 6.3, the United States only admits that it is not aware of any evidence that information pertaining to Kelley's conviction was submitted to the databases available to the NICS, i.e., the FBI's III, NCIC, or NICS Indices.  The allegations of the 3rd sentence are legal conclusions that do not require a

response.  To the extent that a response is required, the United States only admits that it is unaware of any evidence that Kelley's fingerprint identification and criminal disposition reports were submitted by the Air Force to the FBI, and denies the remaining allegations.  The United States denies that it owed a duty to the Plaintiffs that is actionable under Texas law with regard to the FBI's National Instant Criminal Background Search System.

6.4     As a result of one or more of the above acts of negligence, when Academy requested the FBI search its National Instant Criminal Background Search System to determine whether it could sell firearms to Devin Kelley, the FBI notified Academy to "proceed" with the sale.  But for the United States' negligence, there would have been prohibiting information within the FBI's Background Search System.  And but for the United States' negligence, the FBI would have notified Academy that the sale should be "denied."

**Response:**

The allegations of the 1st sentence of paragraph 6.4 that are legal conclusions that do not require a response.  To the extent that a response is required, the United States only admits that NICS gave a "proceed" response.  The United States denies the allegations of the 2nd and 3rd sentences.

6.5     When Devin Kelley attempted to purchase the firearms used in the Sutherland Springs shooting, the sale should have been blocked for one or more of the following reasons: (a) he had a conviction of a crime punishable by imprisonment for a term exceeding one year; (b) he had a conviction for domestic violence; and (c) he had previously been committed to a mental institution.

**Response:**

With regard to the allegations of paragraph 6.5, the United States only admits that the

Staff Judge Advocate's General Court-Martial Order No. 10, dated January 14, 2013, listed

Kelley's conviction and sentence and it has a notation at the top of the order, stating "Crime of

Domestic Violence. 18 U.S.C. §922(g)(9)" and that information pertaining to Devin Kelley's

conviction was not submitted to the databases available to the NICS, i.e., the FBI's III, NCIC, or

NICS Index.  The United States denies the allegation that "When Devin Kelley attempted to

purchase the firearms used in the Sutherland Springs shooting, the sale should have been blocked

. . . [because] . . . he had previously been committed to a mental institution."

6.6     When Devin Kelley purchased the firearms used in the Sutherland Springs

shooting, his omission from the FBI's background check system and ability to complete the

purchase was a direct, proximate, and foreseeable result of one or more acts of negligence of the

Department of Defense and Department of the Air Force.

**Response:**

The allegations of the paragraph 6.6 are legal conclusions that do not require a response.

To the extent that a response is required, the United States denies them.

**B.     Had the Air Force reported Kelley's history, the FBI's Instant
         Criminal Background Check System would have blocked Devin Kelley's firearm
         purchase.**

6.7     Devin Kelley purchased the firearms used in the Sutherland Springs shooting

from a federal firearms licensee, Academy Sports & Outdoor.  At the time, the licensee must

submit biographical information about Kelley to the FBI's Instant Criminal Background Check

System.  If the Air Force had properly reported Devin Kelley's fingerprint cards and history to

the FBI, the Background Check System would have informed the firearms dealer to deny the purchase.

**Response:**

The allegations of the 1st and 2nd sentences of paragraph 6.7 are admitted.  The United States is without sufficient knowledge to admit or deny the allegations of the 3rd sentence and, therefore, denies them.

6.8     The purpose of the Uniform Federal Crime Reporting Act of 1988, the Brady Handgun Violence Prevention Act, and the Domestic Violence Offender Gun Ban are to ensure that violent offenders and high-risk individuals like Kelley do not get access to firearms.  The Department of Defense in 1994 began designing the Defense Incident-Based Reporting System (DIBRS) to meet criminal justice related reporting requirements mandated by the Uniform Federal Crime Reporting Act and the Brady Handgun Violence Prevention Act.  The DIBRS permits the DOD to forward offense and arrest information required by FBI.

**Response:**

The allegations of the 1st sentence of paragraph 6.8 are conclusions of law that do not require a response.  To the extent that a response is required, the United States denies that the purpose of the Uniform Federal Crime Reporting Act of 1988 is to ensure that certain persons do not get access to firearms, and lacks information sufficient to admit or deny the remaining allegations because they are vague and ambiguous.  The United States admits the allegations in the 2nd sentence.  With regard to the allegation of the 3rd sentence, the United States only admits that through DIBRS, DOD forwards offense and arrest information required by FBI without identifying information.

6.9     The entry into the federal law-enforcement database would have blocked Mr. Kelley's purchase of the firearms used in the Sutherland Springs' shooting.  The Government's acts or omissions directly and proximately resulted in Devin Kelley's purchase of the firearms used in the November 5, 2017 Sutherland Springs First Baptist Church shooting.

**Response:**

With regards to the 1st sentence of paragraph 6.9, the term "the federal law-enforcement database" is vague and ambiguous.  The United States is without sufficient knowledge to admit or deny the remaining allegations of the 1st sentence of paragraph 6.9 and, therefore, denies them.  The allegations of the 2nd sentence are legal conclusions that do not require a response. To the extent that a response is required, the United States denies them.

## VII.   DAMAGES

7.1     Devin Kelley used the guns he purchased at Academy Sports & Outdoor to kill twenty-six individuals and injure twenty others on November 5, 2017.

**Response:**

The United States only admits that Devin Kelley killed twenty-six individuals and injured twenty others on November 5, 2017, and that one of the guns he purchased at Academy Sports & Outdoor were retrieved by federal law enforcement after the shooting.

7.2     Plaintiff John Porter Holcombe II brings this action (1) as Next Friend on behalf of minor E.J.H. for her personal injuries, bystander damages and wrongful death claim for the death of her mother, (2) as Next Friend on behalf of minor P.J.H. for his wrongful death claim for the death of his mother, and (3) in his capacity as the Independent Administrator of the Estates of Minors G.L.H., E.R.H., and M.G.H.

**Response:**

The allegations in paragraph 7.2 are conclusions of law that do not require a response. To the extent that a response is required, the United States admits that Plaintiff has brought suit on behalf of the persons and entities named in this paragraph, but denies that Plaintiff is entitled to any relief in this suit.

**7.3**    Minor G.L.H. was shot and killed on November 5, 2017, with firearms that should have been denied to Devin Kelley.  As a result of the negligence of the United States employees, agents, or representatives, the Estate of Minor G.L.H. suffered damages for which recovery is sought, including:

> Past physical pain & suffering;
>
> Past medical expenses;
>
> Past mental anguish;
>
> Past and future lost income and earning capacity, and
>
> Funeral and burial expenses.

**Response:**

The United States admits the allegations in the 1st sentence of paragraph 7.3.  With regard to the 2nd sentence of paragraph 7.3, the United States denies that any harm Plaintiff suffered was "a result of the negligence of the United States employees, agents, or representatives," but is without sufficient knowledge to admit or deny whether Plaintiff suffered such harm.

**7.4.**    In addition, John Porter Holcombe II, as Independent Administrator of the Estate of G.L.H., seeks recovery of all other damages to which the Estate of Minor G.L.H. is entitled pursuant to the applicable state and federal law.

**Response:**

The United States denies that the Plaintiff is entitled to any recovery whatsoever.

7.5     Minor E.R.H. was shot and killed on November 5, 2017, with firearms that should have been denied to Devin Kelley.  As a result of the negligence of the United States employees, agents, or representatives, the Estate of Minor E.R.H. suffered damages for which recovery is sought, including:

> Past physical pain & suffering;
>
> Past medical expenses;
>
> Past mental anguish;
>
> Past and future lost income and earning capacity, and
>
> Funeral and burial expenses.

**Response:**

The United States admits the allegations in the 1st sentence of paragraph 7.5.  With regard to the 2nd sentence of paragraph 7.5, the United States denies that any harm Plaintiff suffered was "a result of the negligence of the United States employees, agents, or representatives," but is without sufficient knowledge to admit or deny whether Plaintiff suffered such harm.

7.6     In addition, John Porter Holcombe II, as Independent Administrator of the Estate of Minor E.R.H., seeks recovery of all other damages to which the Estate of Minor E.R.H. is entitled pursuant to the applicable state and federal law.

**Response:**

The United States denies that Plaintiff is entitled to any recovery whatsoever.

7.7     Minor M.G.H. was shot and killed on November 5, 2017, with firearms that should have been denied to Devin Kelley. As a result of the negligence of the United States

employees, agents, or representatives, the Estate of Minor M.G.H. suffered damages for which recovery is sought, including:

> Past physical pain & suffering;
>
> Past medical expenses;
>
> Past mental anguish;
>
> Past and future lost income and earning capacity, and
>
> Funeral and burial expenses.

**Response:**

The United States admits the allegations in the 1st sentence of paragraph 7.7.  With regard to the 2nd sentence of paragraph 7.7, the United States denies that any harm Plaintiff suffered was "a result of the negligence of the United States employees, agents, or representatives," but is without sufficient knowledge to admit or deny whether Plaintiff suffered such harm.

**7.8**     In addition, John Porter Holcombe II, as Independent Administrator of the Estate of Minor M.G.H., seeks recovery of all other damages to which the Estate of Minor M.G.H. is entitled pursuant to the applicable state and federal law.

**Response:**

The United States denies that Plaintiff is entitled to any recovery whatsoever.

**7.9**     Minor E.J.H. was assaulted on November 5, 2017, with firearms that should have been denied to Devin Kelley. As a result of the negligence of the United States employees, agents, or representatives, Minor E.J.H. suffered individual damages, for which recovery is sought, including:

> Past and future physical pain & suffering;
>
> Past and future mental anguish;

Past and future medical and healthcare expenses;

Past and future physical impairment;

Past and future physical disfigurement;

Past and future lost income and earning capacity;

Past and future loss of consortium with mother, Crystal Holcombe;

Past and future loss of companionship and society with her mother;

Past and future loss of pecuniary contributions, including loss of advice,

counsel, services, care, support, and maintenance from her mother;

Past and future loss of services from her mother, including loss of her

mother's nurturing, care, education, and guidance;

Loss of inheritance;

Out of pocket expenses;

and Other pecuniary damages.

**Response:**

The United States admits the allegations in the 1st sentence of paragraph 7.9.  With regard to the 2nd sentence of paragraph 7.9, the United States denies that any harm Plaintiff suffered was "a result of the negligence of the United States employees, agents, or representatives," but is without sufficient knowledge to admit or deny whether Plaintiff suffered such harm..

**7.10**   On November 5, 2017, Minor E.J.H. and Minor P.J.H.'s mother, Crystal Holcombe, was shot and killed.  As a result of the negligence of the United States employees, agents, or representatives, Minor E.J.H. and Minor P.J.H. suffered individual damages because of the death of their mother, for which recovery is sought, including:

Past and future loss of consortium with their mother, Crystal Holcombe; Past and future loss of companionship and society with their mother, Crystal Holcombe; Past and future loss of pecuniary contributions, including loss of advice, counsel, services, care, support, and maintenance from their mother, Crystal Holcombe; Past and future loss of services from their mother, including loss of their mother, Crystal Holcombe's, nurture, care, education, and guidance; Past and future mental anguish because of the death of their mother, Crystal Holcombe; Loss of inheritance from their mother, Crystal Holcombe; Out of pocket expenses; and Other pecuniary damages.

**Response:**

The United States admits the allegations in the 1st sentence of paragraph 7.10.  With regard to the 2nd sentence of paragraph 7.10, the United States denies that any harm Plaintiff suffered was "a result of the negligence of the United States employees, agents, or representatives," but is without sufficient knowledge to admit or deny whether Plaintiff suffered such harm.

**7.11**    In addition, John Porter Holcombe II, as Next Friend on behalf of Minors P.J.H. and E.J.H., seeks recovery of all other damages to which they are entitled due to the death of their mother, Crystal Holcombe, pursuant to the applicable state and federal law.

**Response:**

The United States denies that Plaintiff is entitled to any recovery whatsoever.

**7.12**     In addition, Plaintiff John Porter Holcombe II, (1) as Next Friend on behalf of minor E.J.H. for her personal injuries, bystander damages and wrongful death claim for the death of her mother, (2) as Next Friend on behalf of minor P.J.H. for his wrongful death claim for the death of his mother, and (3) in his capacity as the Independent Administrator of the Estates of Minors G.L.H., E.R.H., and M.G.H., seeks recovery of all other damages to which he is entitled pursuant to the applicable state and federal law.

**Response:**

The United States denies that Plaintiff is entitled to any recovery whatsoever.

### VIII.  JURISDICTION, VENUE, & SERVICE

**8.1**     This Federal District Court has federal-question jurisdiction of this action because this action is brought pursuant to and in compliance with 28 U.S.C. §§ 1346(b), 2671–2680, commonly known as the Federal Tort Claims Act.

**Response:**

The allegations of paragraph 8.1 are legal conclusions that do not require a response.  To the extent a response is required, the United States only admits that  Plaintiffs' action against the United States was brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680. The United States denies that the Court has subject-matter jurisdiction over the claims asserted in this action.

**8.2**     Venue is proper in this district pursuant to 28 U.S.C. § 3191(e)(1) because the United States is a defendant, Plaintiff resides in this district, and no real property is involved in the action.

**Response:**

The United States denies the allegations of paragraph 8.2.  The United States does not dispute that venue is proper in this Court pursuant to 28 U.S.C. § 1402(b) to the extent that Plaintiffs reside within this district.

**8.3**     The United States of America may be served with process in accordance with Rule 4(1) of the Federal Rules of Civil Procedure.  Service is affected by serving a copy of the Summons and Complaint on the United States Attorney John F. Bash, United States Attorney for the Western District of Texas by certified mail, return receipt requested at his office:

> United States Attorney's Office
> ATTN: Civil Process Clerk
> 601 NW Loop 410, Suite 600
> San Antonio, Texas 78216

**Response:**

The allegations of paragraph 8.3 are legal conclusions that do not require a response.  To the extent a response is required, the United States only admits that service on the United States is properly made in accordance with Rule 4(i)(1)(A) and (B) of the Federal Rules of Civil Procedure, which requires a party to "deliver a copy of the summons and of the  complaint to the United States attorney for the district where the action is brought . . . or . . . the civil-process clerk at the United States attorney's office" and to "send a copy of each by registered or certified mail to the Attorney General of the United States at Washington, D.C. . . ."

**8.4**     Service is also affected by serving a copy of the Summons and Complaint on William Barr, Attorney General of the United States, by certified mail, return receipt requested at:

> The Attorney General's Office
> ATTN: Civil Process Clerk

950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

**Response:**

The United States incorporates its response to paragraph 8.3.

## IX. LIABILITY OF THE UNITED STATES

**9.1**     This case is commenced and prosecuted against the United States of America to and in compliance with Title 28 U.S.C. §§ 2671-80, the Federal Tort Claims Act.  Liability of the United States is predicated specifically on 28 U.S.C. § 2674 because the personal injuries and resulting damages of which the Complaint is made were proximately caused by the negligence, wrongful acts or omissions of employees or agents of the United States of America working for the United States Department of the Air Force or Department of Defense, while acting within the scope of their office, employment, or agency under circumstances where the United States of America, if a private person, would be liable to the Plaintiff in the same manner and to the same extent as a private individual.

**Response:**

The allegations of paragraph 9.1 are legal conclusions that do not require a response.  To the extent a response is required, the United States only admits that the Plaintiffs' action against the United States is under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680.  The United States denies the other allegations of paragraph 9.1.

**9.2**     The United States Departments of Defense and Department of the Air Force are agencies of the United States.  The Defendant, the United States of America, through its agencies, at all times material to this lawsuit, owned and operated Holloman Air Force Base and staffed its facilities and vehicles with its agents, servants and employees.  The Defendant, the United States of America, through its agencies, at all times material to this lawsuit, owned and

operated the Defense Manpower Data Center, which operates the Defense Incident-Based Reporting System.

**Response:**

Admitted.

9.3     The United States, through its agency, the Department of Air Force, at all times material to this lawsuit and at all times described in this lawsuit, owned and operated the following and staffed it with its agents, employees, or representatives:

- Air Force Security Forces;
- Air Force Security Forces Center;
- Air Force Security Forces Academy;
- Air Force Office of Special Investigations Detachment 225;
- 49th Security Forces Squadron;
- Holloman Air Force Base Mental Health Clinic;
- 49th Logistics Readiness Squadron; and
- 49th Security Forces Squadron Confinement Facility.

**Response:**

Admitted.

9.4     This lawsuit is not a claim listed in 28 U.S.C. § 2680, exceptions to the Federal Tort Claims Act.

**Response:**

The allegations of paragraph 9.4 are conclusions of law that do not require a response. To the extent a response is required, the United States denies them.

## X. JURISDICTIONAL ALLEGATIONS

10.1     Pursuant to 28 U.S.C. §§ 2672 and 2675(a), the claims set forth here were filed with and presented administratively to the United States of America on August 27, 2019 via Certified Mail, Return Receipt Requested.  On September 9, 2019, the United States Department

of the Air Force acknowledged receipt of Plaintiff's claims, stating that it had received Plaintiff's claims on September 4, 2019.  The claims stated a "sum certain.

**Response:**

The United States only admits that John Porter Holcombe II, as next of friend of minors E.J.H. and P.J.H., presented administrative claims for $25 million each, which the Air Force received on September 4, 2019.  The United States further admits that the Estates of G.L.H., E.R.H., M.G.H.,  through its independent administrator, Joe Porter Holcombe II, presented administrative claims for $20 million each, which the Air Force received on September 4, 2019. The Air Force did not make a final disposition on the administrative claims within six months of its filing and on March 23, 2020, Plaintiff filed a complaint against the United States.

**10.2**     The United States failed to make final disposition of these claims within six (6) months of presentation of these claims.  This action was filed greater than six (6) months from the presentation of the claims underlying the lawsuit.

**Response:**

The United States incorporates its response to paragraph 10.1.

**10.3**     Accordingly, Plaintiff has complied with all jurisdictional prerequisites and conditions precedent to the commencement and prosecution of this lawsuit.

**Response:**

The United States incorporates its response to paragraph 10.1.

### CONCLUSION

Plaintiff requests that Defendant be cited to appear and answer this Complaint; that upon final trial, the Plaintiff have judgment against Defendant, for the amount of actual damages and for other and different amounts as they shall show by proper amendment before trial; for post-

judgment interest at the applicable legal rate; for all Court costs incurred in this litigation; and for such other relief, at law and in equity, both general and special, to which Plaintiff may show himself entitled to on behalf of all minors identified herein and to which the Court believes Plaintiff deserving.

**Response:**

The United States denies that it is liable to the Plaintiff under the FTCA and denies that the Plaintiff is entitled to any relief.

## DENIAL OF ANY REMAINING ALLEGATIONS

All allegations of the amended complaint that the United States has not specifically and unqualifiedly admitted in its responses above are hereby denied, put in issue, strict proof required.

WHEREFORE, the defendant United States of America demands judgment dismissing all of the claims in Plaintiff's First Original Complaint, and such other and further relief as this Court deems just and proper.

Dated: May 29, 2020

**JOSEPH H. HUNT**
Assistant Attorney General
Civil Division
**JOHN F. BASH**
United States Attorney
Western District of Texas
**JOHN F. PANISZCZYN**
Assistant United States Attorney
State Bar. No. 15443855
**STEPHEN E. HANDLER**
Senior Trial Counsel, Torts Branch
Civil Division
**PAUL DAVID STERN**
Trial Attorney, Torts Branch
Civil Division
**AUSTIN L. FURMAN**
Trial Attorney, Torts Branch
Civil Division

**JOCELYN KRIEGER**
Trial Attorney, Torts Branch
Civil Division


By:    */s/ Daniel P. Chung*
        **DANIEL P. CHUNG**
        Trial Attorney, Torts Branch
        Civil Division
        *Counsel for the United States of America*

## CERTIFICATE OF SERVICE

I certify that on May 29, 2020, I electronically filed the foregoing with the clerk of court by using the CM/ECF system, and that the following counsel of record have received notice and been served through that system.

Jamal K. Alsaffar
Tom Jacob
WHITEHURST, HARKNESS, BREES,
CHENG, ALSAFFAR & HIGGINBOTHAM
& JACOB PLLC
7500 Rialto Blvd, Bldg. Two, Ste 250
Austin, TX 78735

Jason P. Steed
KILPATRICK TOWNSEND & STOCKTON
LLP
2001 Ross Avenue, Suite 4400
Dallas, TX 75201

Robert E. Ammons
April A. Strahan
THE AMMONS LAW FIRM, L.L.P.
3700 Montrose Boulevard
Houston, TX  77006

Dennis Charles Peery
R. Craig Bettis
TYLER & PEERY
5822 West IH 10
San Antonio, TX 78201

Brett Reynolds
Brett Reynolds & Associates PC
1250 N.E. Loop 410, Suite 310
San Antonio, TX 78209

Mark W. Collmer
COLLMER LAW FIRM
3700 Montrose
Houston, TX 77006

Daniel J.T. Sciano
TINSMAN & SCIANO
10107 McAllister Freeway
San Antonio, TX 78216

Daniel D. Barks
SPEISER KRAUSE, P.C.
5555 Glenridge Connector, Suite 550
Atlanta, GA 30342

Tim Maloney
Paul E. Campolo
MALONEY & CAMPOLO, L.L.P.
926 S. Alamo
San Antonio, TX 78205

George LeGrand
Stanley Bernstein
LEGRAND & BERNSTEIN
2511 N. Saint Mary's St.
San Antonio, Texas 78212

*/s/ Daniel P. Chung*
**DANIEL P. CHUNG**
Trial Attorney, Torts Branch